*In re* PETITION TO ADOPT O.J.M., a/k/a O.J.K., a Minor (K.J.R. *et al.*, Petitioners-Appellees; E.M.H., Intervenor-Appellant).

First District (3rd Division)   No. 1—96—2742

Opinion filed October 29, 1997.

Helene M. Snyder, of Chicago, for appellant.

Kathleen Hogan Morrison, of Mandel, Lipton & Stevenson, Ltd., of Chicago, for appellees.

JUSTICE GORDON delivered the opinion of the court:

The appellant, E.M.H., the putative father of O.J.M., a minor, appeals from the section 2—619 (735 ILCS 5/2—619 (West 1996)) dismissal of his petition to determine the existence of the father and child relationship and from the judgment order of adoption entered in favor of the petitioners, the adoptive parents.

The facts alleged in the pleadings show that, during her pregnancy, the mother of the child, H.K., reached an agreement with the petitioners, K.J.R. and D.F.R., to turn the child over to them upon its birth. Prior to the child's birth, the petitioners also discussed the adoption plan with the man alleged by H.K. to have been the child's father, T.M. T.M. was subsequently listed as the father on the child's birth certificate issued on January 23, 1996. The child was born on November 12, 1995; and upon its discharge from the hospital on November 13, 1995, the child was turned over to the petitioners. Two days later, on November 15, 1995, the petitioners filed their petition to adopt in which they alleged the consent of the child's parents. On November 20, 1995, T.M., the alleged father, attended an interview at the office of the Cook County Department of Support Services and signed a final and irrevocable consent to adoption. The child's mother did not appear for her appointment also scheduled with that agency on that date. Pursuant to the petitioners' motion, the court entered an interim order on November 20, 1995, terminating the parental rights of T.M. and awarding temporary custody of the child to the petitioners.

On December 6, 1995, the petitioners filed an amended petition

to adopt. In count I they sought termination of the biological mother's parental rights alleging that she was an unfit person as defined by section 1 of the Adoption Act (750 ILCS 50/1 (West 1994)). The petitioners alleged that the mother was depraved; habitually addicted to drugs, other than those prescribed by a physician for at least one year prior to commencement of the adoption proceeding; unable to discharge parental responsibilities due to mental impairment or mental illness; and had failed to protect the child from conditions within the environment injurious to the child's welfare. In counts II and III of their amended petition, the petitioners sought permanent custody and a "best interests" hearing pursuant to section 20 of the Adoption Act (750 ILCS 50/20 (West 1994)) and sections 601 and 602 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/601, 602 (West 1994)).

On December 22, 1995, the mother filed a verified motion to vacate the interim custody order; and on January 17, 1996, she filed a verified motion for visitation. On February 8, 1996, E.M.H., the appellant, filed, for the first time, a motion for leave to intervene and a motion for blood tests to determine whether he was the child's father. In this combined motion, E.M.H. alleged that he was informed by the child's mother, on or about January 31, 1996, that he, not T.M., was the father of the child. E.M.H. admitted to having had sexual relations with H.K. on several occasions during the period of January to March 1995 within which time the child could have been conceived. The matter was continued by order of the court to February 27, 1996. On February 27, 1996, E.M.H. filed a second motion for leave to intervene and for blood tests. In that unverified motion he alleged new matter, namely, that he had had sexual relations with H.K. on several occasions and that, therefore, he believed that he could be the father of the child. He further alleged that H.K., prior to the birth of the child, told him that he was not the father of the child and, because of that, he had "no notice of his possible paternity until January 31, 1996." E.M.H. was granted leave to file his motion for leave to intervene and for blood tests on February 27, 1996, and the matter was continued to April 16, 1996.

On March 12, 1996, the birth mother filed a verified response to the amended petition to adopt and also moved to dismiss counts II and III of that petition. In her response, she denied that T.M. was the biological father of the child. At the hearing on April 16, 1996, the court reserved ruling and hearing on the birth mother's pending motions; set trial on count I of the amended adoption petition; and directed the commencement of blood testing, with the results to be held *in camera*. The court also entered an order granting E.M.H.

leave to file a "proper" petition to intervene and a parentage petition. E.M.H. filed a petition to determine the existence of the father and child relationship on April 26, 1996. The petitioners moved to dismiss E.M.H.'s motion for leave to intervene and for blood tests and his parentage petition. Hearing on that motion was set for July 2, 1996.

During the period of April to June 1996, the birth mother did not respond to petitioners' discovery requests and failed to appear for her deposition. On May 21, 1996, the court granted the motion of her counsel to withdraw his appearance. On June 6, 1996, petitioners moved to strike the birth mother's answer and moved for an order holding her in default and terminating her parental rights. On June 13, 1996, finding that due notice had been given the birth mother, the court struck her answer and entered a default order sustaining the allegations in the amended adoption petition that H.K. was depraved, habitually addicted to drugs, unable to discharge parental responsibilities because of mental impairment or mental illness and that she failed to protect the child from an injurious environment. The court thereafter terminated H.K.'s parental rights.

At the July 2, 1996, hearing on the petitioners' motion to dismiss E.M.H.'s motion for leave to intervene and his parentage petition, the court ruled that it would allow E.M.H. to file his petition to intervene. It dismissed E.M.H.'s parentage petition pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1996)), finding that E.M.H.'s petition was barred because E.M.H. failed to register with the Putative Father Registry within 30 days of the child's birth as required by section 12.1 of the Adoption Act (750 ILCS 50/12.1 (West 1994)).[1] On July 3, 1996, the court entered its order granting E.M.H.'s motion for leave to intervene and for blood tests; granted E.M.H. leave to file his parentage petition; granted the petitioner's motion to dismiss E.M.H.'s parentage petition with prejudice; and ordered disclosure of the blood test results to E.M.H. and the petitioners through their attorneys. By separate order, also on that date, the court entered judgment on the amended adoption petition adjudicating the child to be the legal child of K.J.R. and D.F.R. and changing his name to H.D.R. E.M.H. filed his notice of appeal on July 30, 1996.

On appeal, E.M.H., the putative father, argues that the trial court erred in dismissing his parentage petition by reason of his fail-

---

[1]In point of fact, E.M.H. never registered with the Putative Father Registry but only filed a parentage petition in the circuit court, which petition was filed more than 30 days after the birth of the child.

ure to comply with the provisions of the Adoption Act regarding the timely registration with the "Putative Father Registry." E.M.H. contends that his failure to register should be excused because of the biological mother's misrepresentation concerning the identity of the child's father. E.M.H. alternatively argues that the putative father registry provisions of the Adoption Act deprived him of his constitutional equal protection and due process rights.

## I. Putative Father Registry Provisions

■ Section 12.1 of the Adoption Act, which became effective on July 3, 1994, created the Putative Father Registry to be maintained by the Department of Children and Family Services. 750 ILCS 50/12.1 (West 1994). The purpose of that registry is to determine the identity and location of putative fathers whose paternity has not been established in order that they may be given notice of any ensuing adoption proceedings. 750 ILCS 50/12.1 (West 1994). Subsection (b) of section 12.1 states that the "putative father may register with the Department before the birth of the child but shall register no later than 30 days after the birth of the child." 750 ILCS 50/12.1(b) (West 1994). Subsection (g) of section 12.1 further states:

"Except as provided in Section 8(b) of this Act,[2] a putative father who fails to register with the Putative Father Registry as provided in this Section is barred from thereafter bringing or maintaining any action to assert any interest in the child, unless he proves by clear and convincing evidence that:

(1) it was not possible for him to register within the time period specified in subsection (b) of this Section; and

(2) his failure to register was through no fault of his own; and    .

(3) he registered within 10 days after it became possible for him to file.

A lack of knowledge of the pregnancy or birth is not an acceptable reason for failure to register." 750 ILCS 50/12.1(g) (West 1994).

This provision and other related amendatory provisions were enacted by the Illinois legislature in response to the Illinois Supreme Court case of *In re Petition of Doe*, 159 Ill. 2d 347, 638 N.E.2d 181 (1994). House Bill 2424, which was approved and signed into law on July 3, 1994, 17 days after *Doe* was filed, amended various statutory provisions affecting newborn adoptions, older child adoptions, foster

---

[2]Subsection 12.1(g) of the Adoption Act was amended to include section 8(c) as well as section 8(b) as exceptions. Pub. Act 89—315, § 5, eff. January 1, 1996.

families, juvenile court records and interstate child support. Pub. Act 88—550, eff. July 3, 1994. See generally S. Bostick, *The Baby Richard Law: Changes to the Illinois Adoption Act*, 82 Ill. B.J. 654 (1994) (hereinafter S. Bostick, *The Baby Richard Law*). By adding and amending various provisions of the Adoption Act, the legislature sought to balance the interests of the biological mother, the putative father, the adopting parents and the child, specifically indicating, however, that the best interests and welfare of the child were to be of paramount consideration. 750 ILCS 50/20a (West 1994). With respect to the parental rights of putative fathers, the statute protects those putative fathers who have taken certain specified actions to preserve their rights. See 750 ILCS 50/8(b), (c) (West 1994); 750 ILCS 12a(1.5)(c) (West 1994) (recodified at 750 ILCS 50/7C (West 1996)). If the putative father has not so acted within the time limits provided by statute, the child's right to a stable environment and finality becomes paramount, and the putative father loses all right to intervene in adoption proceedings or to vacate finalized adoption orders. See *Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983).

In accordance with that rationale, subsection 12.1(h) of the Adoption Act provides that the failure to timely register results in a waiver and surrender of any right to notice of any hearing in any judicial proceeding for the adoption of the child; negates the requirement of consent and surrender of that person to the adoption; constitutes an abandonment of the child; and is *prima facie* evidence of sufficient grounds to support termination of such father's parental rights under the Adoption Act. 750 ILCS 50/12.1(h) (West 1994). For other putative father registry statutes see, *e.g.*, Ariz. Rev. Stat. Ann. § 8—106.01 (West Supp. 1996); Ark. Code Ann. §§ 9—9—224, 20—18—701 through 20—18—705 (Michie 1993 & Supp. 1995); Ind. Code Ann. §§ 31—19—5—1 through 31—19—5—25 (Michie 1997); N.M. Stat. Ann. §§ 32A—5—19, 32A—5—20 (Michie 1995 & Supp. 1997); N.Y. Dom. Rel. Law § 111—a (McKinney 1988 & Supp. 1997), N.Y. Soc. Serv. Law § 373—c (McKinney 1992).

E.M.H. does not dispute the fact that he did not register with the Putative Father Registry. He argues, however, that the registration requirement is inapplicable here, where it is alleged that the biological mother committed fraud in identifying the biological father as someone other than E.M.H. In support of this argument, E.M.H. concedes that mere lack of knowledge of pregnancy or birth would not excuse registration. He contends, however, that here the lack of knowledge was of his paternity and that this lack of knowledge was attributable to H.K.'s fraud.

■ We first note that the characterization of the biological

mother's misrepresentation as fraudulent does not conform with the traditional definition of that term since the biological mother is not a party to this proceeding and, in opposing the adoption, aligned herself with the interests of E.M.H. rather than the adoptive parents. There is no allegation of any fraudulent conduct on the part of the adoptive parents, unlike the circumstances alleged in *In re Petition of Doe*, 159 Ill. 2d 347, 638 N.E.2d 181 (1994), where the court found that the adoptive parents participated in an attempt to conceal the birth of the child from the father.

More overridingly, however, the birth mother's misrepresentation in this case would not sufficiently justify reliance on the part of the father so as to excuse his obligation to register. See *City of Chicago v. American National Bank & Trust Co.*, 233 Ill. App. 3d 1031, 599 N.E.2d 1126 (1992) (person charging another with fraud must show that his reliance upon fraudulent representation was reasonable under the circumstances). Despite H.K.'s initial statement to E.M.H. that he was not the father, E.M.H. had independent knowledge of the fact that he could have been the father. By his own admissions in his motion to intervene and in his parentage petition, E.M.H. stated that he had had extended sexual relations with H.K. during the time span within which the child could have been conceived and that E.M.H. knew of H.K.'s ensuing pregnancy before the birth of the child. Moreover, E.M.H.'s statement that he "believed" that he could be the father of H.K.'s child inferentially admits to the fact that his sexual relations with H.K. occurred without the use of any prophylaxis. See S. Bostick, *The Baby Richard Law*, 82 Ill. B.J. at 657, stating:

> "A father's lack of knowledge of the pregnancy or birth does not justify his failure to register—the drafters observed the biological imperative that the father participated in the child's conception, and therefore was on notice that a child could have been born nine months hence."

We further note that, given these circumstances, there was no demonstrated basis for E.M.H. to presume that H.K. could have known with any reasonable certainty that he was not the father of her child. All that H.K. reasonably could have been presumed to know is that a man other than E.M.H. could also have shared in the possibility of being the father of her child. There is no basis to condone reliance by E.M.H. upon H.K.'s categorical assertion that he was not the father. Such knowledge of E.M.H. of possible parentage, albeit uncertain, is sufficient to invoke the registration provisions of the Putative Father Registry statute. 750 ILCS 50/12.1 (West 1994).

The Putative Father Registry statute does not require certainty

by the putative father that he is in fact the biological father at the time he registers. The statute defines "putative father" as

"a man who *may* be a child's father, but who (1) is not married to the child's mother on or before the date that the child was or is to be born and (2) has not established paternity of the child in a court proceeding before the filing of a petition for the adoption of the child." (Emphasis added.) 750 ILCS 50/1(R) (West 1994).

By its very definition, a putative father is one who has not established paternity and, thus, would not know with certainty whether he is in fact the biological father until court proceedings are initiated by the filing of a parentage petition and the establishment of paternity thereafter. All that a male need know in order to register in accordance with the statute is that he *may* be the father.

While the result in a given case may seem unduly stringent, one must look to the overall policy and purpose of the statute that the court is called upon to enforce. As noted, the registry requirements of the Adoption Act seek to balance the interests of the putative father with the interests of the adoptive parents and, more overridingly, the child, whose interests are paramount (750 ILCS 50/20a (West 1994) ("[t]he best interests and welfare of the person to be adopted shall be of paramount consideration in the construction and interpretation of this Act")). See S. Bostick, *The Baby Richard Law*, 82 Ill. B.J. at 656. Thus, the statute purports only to ensure that a putative father, who registers *promptly*, that is, within the time limits specified in the statute, is notified of adoption proceedings so that he can assert his parental rights while those proceedings are pending. 750 ILCS 50/ 12.1 (West 1994). Concomitantly, it also purports to ensure the child's right to a stable environment by limiting judicial discretion with respect to the termination of the putative father's parental rights when those rights are first asserted after the statutory time limits for registration have expired. See 750 ILCS 50/20a (West 1994) ("[i]t is in the best interests of persons to be adopted that this Act be construed and interpreted so as not to result in extending time limits beyond those set forth herein"). See also S. Bostick, *The Baby Richard Law*, 82 Ill. B.J. 654. The registration requirement avoids the injection of uncertainty and instability in the adoption process.[3]

Here, E.M.H. knew that he had had sexual relations with the

---

[3]We note that the interest in finality and stability in the adoption process is lessened where, as here, the unregistered putative father acts beyond the time limits of section 12.1 of the Adoption Act but while the adoption action is pending. However, the Adoption Act does not treat differently those unregistered putative fathers who act to preserve their parental interests while the adoption proceedings are pending from those who act after the

birth mother and could have exercised his right to register from the date of those acts until 30 days after the day the child was born. He has not alleged that it was impossible for him to register during that time. Notwithstanding H.K.'s initial disclaimer of E.M.H.'s parentage, there can be no dispute that E.M.H. had substantial reason to suspect the possibility of his parentage since he knew of the pregnancy and of his extended sexual cohabitation with H.K. during the window period of conception. There would be no basis to warrant reliance on the mere disclaimer of H.K. without further investigation and proof. At best, such a disclaimer would simply act to give transitory reassurance to a potential father that the mother did not, as of that time, herself intend to involve him, legally or otherwise, in the responsibility of parentage. That is not sufficient to exculpate the putative father's duty to register. As noted, the Adoption Act provides that "lack of knowledge of the pregnancy or birth is not an acceptable reason for failure to register." 705 ILCS 50/12.1(g) (West 1994). If anything, this denotes that the Adoption Act requires positive effort by the putative father to ascertain whether he is the biological father and to pursue his parenting rights and obligations notwithstanding the silence, passivity or miscommunication of the mother with regard to paternity.

Lastly, while we need not reach this issue, we note that even if E.M.H. reasonably could have relied on H.K.'s misrepresentation and even if such reliance could have excused E.M.H. from registering during the statutory time period, he would not have been excused permanently from registering. The Adoption Act explicitly states that, if it was impossible for the putative father to register before the expiration of 30 days following the birth of the child, he must register within 10 days after it becomes possible for him to do so. 705 ILCS 50/12.1(g)(3) (West 1994). Here, E.M.H. admitted that he learned of H.K.'s alleged fraud on January 31, 1995. Nevertheless, E.M.H. failed to register within 10 days of that date or for that matter at any time thereafter.

Thus, as E.M.H. failed to timely register and as E.M.H. did not allege facts that would bring him within the exceptions to section 12.1(g) of the Adoption Act, he was barred from bringing or maintaining his parentage petition and that petition was properly dismissed pursuant to section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 1996)). 750 ILCS 50/12.1(g) (West 1994).

---

adoption has been finalized. Therefore, the registration requirements that apply to interventions after the adoption decree has been finalized must be applied correspondingly to interventions that take place during the pendency of the adoption action.

## II. Constitutional Claims

E.M.H. alternatively argues that if the provisions of sections 12.1(g) and (h) of the Adoption Act operate to deprive him of his right to proceed with his parentage petition, then those provisions are unconstitutional because they deprive him of equal protection of the laws and due process. E.M.H. argues that he is denied equal protection because he is treated differently from fathers whose parental rights are regulated by the adoption provisions found within the Illinois Juvenile Court Act of 1987 (the Juvenile Court Act) (705 ILCS 405/1—1 *et seq.* (West 1994)). He also argues that he is deprived of a liberty interest to have personal contact with his child and that he was deprived of that interest without procedural due process.

### A. Equal Protection

■ In accordance with the equal protection guarantees of the United States Constitution (U.S. Const., amend. XIV), a state may not draw distinctions based solely on differences that are irrelevant to a legitimate governmental objective. *Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983); *Nevitt v. Langfelder*, 157 Ill. 2d 116, 623 N.E.2d 281 (1993). The legitimate governmental objective with respect to the enactment of adoption laws is to promote the best interest of the child, to protect the rights of interested third parties and to ensure promptness and finality. *Lehr*, 463 U.S. at 265, 77 L. Ed. 2d at 629, 103 S. Ct. at 2995. Those interests were specifically recognized in the stated purpose to Public Act 88—550, the legislation creating the Putative Father Registry and amending various provisions within the Adoption Act relative to the rights of putative fathers. Pub. Act 88—550, eff. July 3, 1994. See also *In re Joseph B.*, 258 Ill. App. 3d 954, 630 N.E.2d 1180 (1994) (purpose of Adoption Act is to promote the finality and stability of adoptions).

■ As noted above, E.M.H. argues that section 12.1 of the Adoption Act is unconstitutional because it subjects him to disparate treatment from other similarly situated putative fathers whose parental rights are regulated by the adoption provisions found within the Juvenile Court Act (705 ILCS 405/1—1 *et seq.* (West 1994)). E.M.H. cites to the putative father notice provision in section 2—30 of the Juvenile Court Act (705 ILCS 405/2—30 (West 1994)), which governs the adoption of children found to be abused, neglected or dependent. He notes that the notice provided to a putative father under that act allows the putative father 30 days from his receipt of the notice to declare paternity or request notification of further proceedings. See 705 ILCS 405/2—30.2 (West 1994). E.M.H. further notes that he was treated differently under the Adoption Act because he

was not given notice or a 30-day time limit thereafter to file a paternity petition. E.M.H. contends that the Adoption Act and the Juvenile Court Act are to be considered *in pari materia* as parts of an overall statutory scheme that promotes the best interests of children. He contends that the differential treatment afforded putative fathers under the Adoption Act, when considered in conjunction with the Juvenile Court Act, lacked rationality and is unconstitutional. We disagree.

First, we do not perceive that putative fathers are treated disparately under each of these Acts. The Adoption Act specifically states that it should be construed in concert with the Juvenile Court Act. See 750 ILCS 50/2.1 (West 1994). Moreover, section 2—29 of the Juvenile Court Act, which allows for the adoption of abused, neglected or dependent minors who are made wards of the court, specifically incorporates by reference many of the provisions in the Adoption Act, including those with respect to the requirements for notice and consent. See, *e.g.*, 705 ILCS 405/2—29(1) ("[a] ward of the court under this Act *** may be the subject of a petition for adoption under [the Adoption Act]"), 2—29(2) (requiring proof of unfitness of nonconsenting parent as defined in Adoption Act), 2—29(3) (requiring written consent of parent to court order authorizing the guardian to consent to adoption in form provided under Adoption Act) (West 1996).[4] See also *In re J.M.*, 245 Ill. App. 3d 909, 613 N.E.2d 1346 (1993) (stating that Juvenile Court Act is to be construed in concert with the Adoption Act).

Under section 2—29 of the Juvenile Court Act, adoption of abused, neglected or dependent minors who are made wards of the court is allowed to proceed, depending upon the circumstances, under three alternative routes: by the court's consent (705 ILCS 405/2—29(1) (West 1994)); by the consent of the parents "in the manner required by such [the Adoption] Act" (705 ILCS 405/2—29(1) (West 1994)); or by the consent of the guardian of the person who is appointed by the court with the consent of the parents or upon the

---

[4]Since the references in section 2—29 of the Juvenile Court Act cite to the Adoption Act "as now or hereafter amended" or "as amended," it is clear that the Juvenile Court Act, as the incorporating statute, would incorporate any subsequent additions or modifications of the Adoption Act as well as its preexisting provisions. See *Kloss v. Suburban Cook County Tuberculosis Sanitarium District*, 404 Ill. 87, 88 N.E.2d 89 (1949). Thus, the amendments made to the Adoption Act by Public Act 88—550, which are the subject of the instant appeal, would be incorporated into the Juvenile Court Act as so expressed in the latter statute.

court's finding of parental unfitness as defined in section 1 of the Adoption Act (705 ILCS 405/2—29(2) (West 1994)). Thus, when the adoption under the Juvenile Court Act occurs pursuant to the consent of the parents, it must proceed "in the manner required by [the Adoption] Act" (705 ILCS 405/2—29(1) (West 1994)). The consent necessary under the Adoption Act would of necessity be the consent of those parents identified in subsections 8(b) and (c) of the Adoption Act, namely, the mother of the child and the father who falls within one of the categories delineated in section 8(b)(1)(B) or 8(c)(1)(B) of the Adoption Act (750 ILCS 50/8(b)(1)(B), (c)(1)(B) (West 1994)). Specifically included within those delineations is the putative father who registers with the Putative Father Registry and who has commenced legal proceedings to establish paternity. 750 ILCS 50/8(b)(1)(B)(vii), (c)(1)(B)(vii) (West 1994).[5]

Section 2—30 of the Juvenile Court Act, which as mentioned previously deals with the notice entitlement to putative fathers, does not explicitly reference the Adoption Act. That provision is virtually identical to the notice of putative father provision in section 12a of the Adoption Act.[6] Under both provisions, that notice is given upon the written request of any interested party, namely, persons intend-

---

[5]It is undisputed that E.M.H. does not come within any of the other categories of putative fathers whose consent is required. Those categories include: the father who is married to the mother of the child on the date of birth of the child, except for a husband or former husband who has been found by a court of competent jurisdiction not to be the biological father of the child; the father of the child under judgment for adoption or an order of parentage; in the case of a child placed for adoption who is less than six months of age, the father who openly lived with the child, the child's biological mother or both and who held himself out to be the biological father during the first 30 days following the birth of the child; in the case of a child less than six months of age, the father who made a good-faith effort to pay a reasonable amount of birth expenses and financial support before expiration of 30 days following the birth of the child; in the case of a child more than six months old, the father who has maintained substantial and continuous or repeated contact with the child as manifested by payment of reasonable child support, by visitation at least monthly, or regular communication with the child; and in the case of a child more than six months old, the father who has openly lived with the child for a period of six months within the one-year period immediately prior to placement of the child for adoption and openly held himself out to be the father of the child. 750 ILCS 50/8(b)(1)(B)(i) through (1)(B)(vi), (c)(1)(B)(i) through (1)(B)(vi) (West 1994).

[6]At the time the adoption proceedings were initiated in the instant case, section 12a of the Adoption Act (750 ILCS 50/12a (West 1994)) differed from section 2—30 of the Juvenile Act in that it also contained a separate notice

ing to adopt the child, a child welfare agency with whom the mother has placed or has given notice of her intention to place the child for adoption, the mother of the child, or any attorney representing an interested party. 705 ILCS 405/2—30 (West 1994); 750 ILCS 50/12a.1 (West 1994). The form and content of the notice, as specified under both provisions, inform the putative father that, as the alleged father of the child, he has certain legal rights with respect to the child and further inform the putative father that if he wishes to retain those rights he must file with the clerk of the circuit court a declaration of paternity, a copy of which is enclosed with the notice, within 30 days of the receipt of the notice stating that he is the father of the child, that he intends to retain his legal rights with respect to the child, or that he requests to be notified of any further proceedings with respect to custody or adoption of the child. The notice also advises the putative father that a failure to file the declaration of paternity or a request for notice results in the termination of whatever legal rights he may have with respect to the child. See 705 ILCS 405/2—30(2) (West 1994); 750 ILCS 50/12a(2) (West 1994). In accordance with the notice provisions of both statutes, if the putative father does not file a declaration for paternity within 30 days, he need not be made a party to or be given notice of any adoption proceeding. 705 ILCS 405/2—30(4) (West 1994); 750 ILCS 50/12a(4) (West 1994).

While section 2—30 of the Juvenile Court Act on its face does not purport to except those unregistered putative fathers who would be required to register under section 12.1 of the Adoption Act, neither are such putative fathers excepted on the face of section 12a of the Adoption Act. Yet one can only conclude that such putative fathers who have failed to register would not be entitled to notice under section 12a of the Adoption Act since it is clear from the content of the notice that it is intended only for putative fathers whose consent would be required. Since it also is clear from section 12.1(h) of the

---

requirement for putative fathers whose consent was not needed but who were entitled to notice of the adoption proceedings. That provision, section 12a(1.5), was enacted as part of Public Act 88—550 and became effective July 3, 1994. Effective January 1, 1996, subsection 1.5 of section 12a was transferred to section 7 of that act and is now codified as 750 ILCS 50/7C (West 1996). See Pub. Act 89—315, § 5, eff. January 1, 1996 (amending 750 ILCS 50/7, 12a (West 1994)). As a result of this change, sections 2—30 of the Juvenile Court Act and 12a of the Adoption Act are almost identical in language and purpose. For purposes of this opinion, our reference to section 12a will refer to that provision as it exists without former subsection 1.5, which is now incorporated in section 7 of the Adoption Act. The impact, if any, of former subsection 1.5 is further discussed *infra*, at footnote 7.

Adoption Act that such a right to consent would be waived by a failure to register, there would be no purpose served by providing those putative fathers with a section 12a notice. Likewise, such putative fathers who have failed to register would not have a right to consent to adoptions under the Juvenile Court Act pursuant to subsections 8(b)(1)(B)(vii) and 8(c)(1)(B)(vii) of the Adoption Act which, as noted above, are incorporated by reference into the Juvenile Court Act pursuant to section 2—29(1) of that Act.

Thus, once it is determined under section 2—29 of the Juvenile Court Act that no consent is required of a putative father because that alleged father does not satisfy one of the categories set forth in section 8 of the Adoption Act, the notice requirements to a putative father under section 2—30 of the Juvenile Court Act, just as the notice requirements under section 12a of the Adoption Act, become inapplicable. The right to consent, once excluded under section 12.1(h) of the Adoption Act and, correspondingly, by reference under section 2—29(1) of the Juvenile Court Act, is not restored by the ensuing notice provisions of section 12a and 2—30, respectively, simply because they do not specifically refer back to those exclusions.[7] Rather, as discussed, the most cogent construction of the notice provision at section 12a of the Adoption Act and, correspondingly, section 2—30 of the Juvenile Court Act, as reflected in their substantially identical content, is that they will follow the right to consent as carved out in subsections 8(b) and (c) of the Adoption Act and the corresponding section 2—29(1) of the Juvenile Court Act. Accordingly, a putative father who, like E.M.H., does not register and initiate paternity proceedings thereafter would not be entitled to section 2—30 notice

---

[7]This analysis is further corroborated by the fact that section 12a(1.5) of the Adoption Act (750 ILCS 50/12a(1.5) (West 1994) (relocated at 750 ILCS 50/7C (West 1996), see *supra*, at footnote 6)) specifically provides for a separate notice to certain putative fathers who have forfeited their rights to consent. Under that provision, those putative fathers are entitled only to notice of adoption proceedings in order that they might present evidence relevant to the best interests of the child but in no event are they entitled to assert a right of consent. A putative father who registers but does not initiate a parentage action within 30 days of that registration is one of the designated recipients of this notice. It would therefore be nonsensical to presume that a putative father who loses the right to consent because he never registered could have that right restored under section 12a(2) (750 ILCS 50/12a(2) (West 1994)), while the putative father who registers but fails to file a parentage petition is clearly denied the right to consent under the explicit language of section 12a(1.5).

under the Juvenile Court Act; and the purported difference in the notice requirements of the two acts argued by E.M.H. does not exist.

Moreover, even if there was no incorporation by reference of the provisions of the Adoption Act into the Juvenile Court Act, there would be no violation of equal protection. The equal protection clause does not require the legislature to address all areas of a problem that it seeks to reform. As stated in *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 372-73, 489 N.E.2d 1374, 1384 (1986):

> "A legislature is 'allowed to take reform "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" [citation]; and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.' (*McDonald v. Board of Election Commissioners* (1969), 394 U.S. 802, 809, 22 L. Ed. 2d 739, 746, 89 S. Ct. 1404, 1409; see also *Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 367[, 483 N.E.2d 1245]; *Rockford Drop Forge Co. v. Pollution Control Board* (1980), 79 Ill. 2d 271, 281[, 402 N.E.2d 602.])"

In *Harris*, the court upheld a law that applied to private nursing homes and exempted state-operated nursing homes, stating that the legislature could believe that the protections of the statute were more urgently needed by private nursing home residents than state-operated nursing home residents. Following this principle, the Illinois Supreme Court in *People v. Esposito*, 121 Ill. 2d 491, 521 N.E.2d 873 (1988), held that there was no equal protection violation where the legislature elected to penalize persons who drive with a blood-alcohol concentration of 0.10 with summary suspension while not requiring summary suspension for other categories of impaired drivers. The court found that the General Assembly enacted the summary suspension scheme in response to "widespread concern over the threat which drunk drivers pose to safety and human life in our society." *Esposito*, 121 Ill. 2d at 503, 521 N.E.2d at 878. In reliance on *Harris*, the court found that the equal protection guarantee did not prohibit the legislature from choosing to focus particularly on the hazard posed by drunk drivers. Accord *People v. Mondhink*, 194 Ill. App. 3d 806, 551 N.E.2d 755 (1990) (no denial of equal protection where legislature enacted an enhanced penalty for repeat offense of driving while license revoked where original revocation was predicated on certain offenses and not others; court found that legislature limited enhancement provision to predicate offenses posing the greatest threat to the motoring public).

Here, the amendments to the Adoption Act that resulted from

the passage of House Bill 2424 were designed to avoid the injection of uncertainty and instability in adoptions arising under the Adoption Act seen as an outflow from *In re Petition of Doe*, 159 Ill. 2d 347, 638 N.E.2d 181 (1994). See generally S. Bostick, *The Baby Richard Law*, 82 Ill. B.J. 654. In its effort to accomplish that result, the legislature turned first to the Adoption Act, the avenue by which most adoptions occur. It is common knowledge that adoptions in this state are initiated primarily under the Adoption Act, as was the adoption in *In re Petition of Doe*, rather than under the Juvenile Court Act. It is well known that as a matter of practice in Cook County all adoptions are initiated in the county division of the circuit court under the Adoption Act rather than in the juvenile division of the circuit court under the Juvenile Court Act. Thus, as such, the amendments to the Adoption Act would suffice to cover the overwhelming number of adoptions that take place in this state.

## B. Due Process

■ E.M.H. next contends that section 12.1 of the Adoption Act deprived him of a liberty interest to have personal contact with his child and that he was deprived of that interest without notice and opportunity to be heard.

The relationship between parent and child is constitutionally protected by the due process clause of the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV). *E.g., Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614, 103 S. Ct. 2985 (1983); *Quilloin v. Walcott*, 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978); *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972). However, the parent's right to maintain his or her parental relationship with the child depends not on the mere biological connection but on the existence of a relationship with the child that is more enduring. *Lehr*, 463 U.S. at 260, 77 L. Ed. 2d at 626, 103 S. Ct. at 2992, citing *Caban v. Mohammed*, 441 U.S. 380, 397, 60 L. Ed. 2d 297, 310, 99 S. Ct. 1760, 1770 (1979) (Stewart, J. dissenting). As stated in *Lehr*:

> "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' *Caban*, 441 U.S., at 392, [60 L. Ed. 2d at 307, 99 S. Ct. at 1768,] his interest in personal contact with his child acquires substantial protection under the Due Process Clause. ***
>
> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the

child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." 463 U.S. at 261-62, 77 L. Ed. 2d at 626-27, 103 S. Ct. at 2993-94.

Accord *In re Appeal in Pima County Juvenile Severance Action No. S—114487*, 179 Ariz. 86, 94, 876 P.2d 1121, 1129 (1994) ("an unwed father's parental rights do not attain fundamental constitutional status unless he takes significant steps to create a parental relationship").

In *Lehr*, the putative father raised a due process claim identical to that which is raised in the instant case. The facts in that case showed that the father had very little contact with the child. He lived with the child's mother before the child was born and visited the child in the hospital after she was born. There appears to have been no contact thereafter. When the child was two years old, her mother's husband petitioned to adopt her. No notice of that proceeding was provided to the putative father, and the adoption was approved. Thereafter, the putative father moved to vacate the adoption order because he was not provided with notice.

The New York statutory scheme under review in *Lehr* required that notice of adoption be given to seven categories of putative fathers who, as the Court explained, were likely to have assumed some responsibility for the care of their natural children. N.Y. Dom. Rel. Law § 111—a(2) (McKinney 1977 & Supp. 1982-83). See *Lehr*, 463 U.S. at 263, 77 L. Ed. 2d at 627, 103 S. Ct. at 2994. Included as one of the seven categories was the putative father who filed with the putative father registry. N.Y. Dom. Rel. Law § 111—a(2)(c) (McKinney 1977 & Supp. 1982-83). The Supreme Court reviewed this notice provision and found that it adequately protected the appellant's inchoate interest in establishing a relationship with his child. The Court found that the statute was procedurally adequate because it did not exclude responsible fathers and because "[the] qualification for notice [was not] beyond the control of an interested putative father," finding that all the father need do was mail a postcard to the putative father registry. *Lehr*, 463 U.S. at 263-64, 77 L. Ed. 2d at 628, 103 S. Ct. at 2994-95. Finally, the Court stated that the New York legislature's refusal to adopt a more "open-ended notice requirement" was not arbitrary given the state's legitimate interest in "facilitating the adoption of young children and having the adoption proceeding completed expeditiously." *Lehr*, 463 U.S. at 264-65, 77 L. Ed. 2d at 629, 103 S. Ct. at 2995.

The Illinois adoption laws, like the New York statutes considered in *Lehr*, provide a statutory scheme that protects the putative father's interest in assuming a responsible role in the future of his child. As with the New York statute, the Illinois Adoption Act provides a putative father registry and requires that notice of adoption be given to those putative fathers who assert their rights by filing with the registry. Compare 750 ILCS 50/12(1), 12a(1.5), 12a(2) (West 1994) with N.Y. Soc. Serv. Law § 372—c (McKinney Supp. 1982-83) and N.Y. Dom. Rel. Law § 111—a(2) (McKinney 1977 & Supp. 1982-83). Also as in New York, Illinois has a legitimate state interest in limiting the rights of putative fathers who do not grasp the opportunity to assume responsibility for the child. That interest was expressed in prefatory language in Public Act 88—550 as ensuring stable living environments for children, according biological parents reasonable opportunities to acknowledge parenthood and affording adoptive parents the ability to reasonably rely on the adoption courts for timely completions of adoptions. See Pub. Act 88—550, eff. July 3, 1994.

Here, as in *Lehr*, the putative father failed to register and did not fall within any of the other statutory categories wherein he would have been entitled to notice of the adoption proceedings. The putative father's statutory right to receive notice was completely within his control as was his right to commence legal proceedings to establish paternity. E.M.H., the putative father, failed to act to preserve his inchoate interest in establishing a relationship with his child by registering and initiating a parentage action and thus, was not entitled to notice or opportunity to be heard in the adoption proceedings. See also *In re Appeal in Maricopa County, Juvenile Action No. JS—8490*, 179 Ariz. 102, 876 P.2d 1137 (1994) (if a man has reasonable grounds to know that he might have fathered a child, he must protect the parental rights by investigating the possibility and acting appropriately); *Robert O. v. Russell K.*, 80 N.Y.2d 254, 640 N.E.2d 99, 590 N.Y.S.2d 37 (1992) (unwed father with no knowledge of pregnancy or birth before adoption finalized lacked due process liberty interest and right to notice and to consent to adoption because he did not manifest a willingness to establish relationship with child); *In re Adoption of S.J.B.*, 294 Ark. 598, 745 S.W.2d 606 (1988) (where father not interested enough in outcome of sexual encounter, due process not violated where statute did not require notice to him of adoption). Thus, the Illinois adoption statute, like the New York statute under

review in *Lehr*, did not deprive E.M.H. of his due process rights guaranteed by the United States Constitution.[8]

For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

CAHILL and LEAVITT, JJ., concur.

---

[8]In a motion taken with the case, E.M.H. moved to supplement the record on appeal with the blood test results that became available after his notice of appeal had been filed. The petitioners filed objections to that motion. E.M.H.'s motion to supplement the record is denied. First, we note that the supplemental matter that is the subject of the motion did not exist nor was it considered by the trial court prior to the court's entry of its final orders. See *Knight's Prairie Hunting Club, Inc. v. Holmes*, 263 Ill. App. 3d 455, 636 N.E.2d 29 (1994) (Supreme Court Rule 329 (134 Ill. 2d R. 329) allows parties to supplement the record with documents that were before the trial court). More convincingly, however, is the fact that, even if the results were available to the court prior to entry of final judgment, those results would have had no bearing on that judgment or the appeal taken from that judgment. For the reasons discussed in part I of this opinion, the existence of a biological link between E.M.H. and the child is not dispositive. The issue here was whether E.M.H. lost any rights he may have had with respect to the child because he failed to register with the Putative Father Registry and because that failure was not excused by section 12.1 of the Adoption Act. 750 ILCS 50/12.1 (West 1994). Although the court ordered the blood testing, it did so while petitioners' motion to dismiss E.M.H.'s motions and parentage petition were pending. Because of the application of section 12.1 of the Adoption Act, the question of parentage was never a dispositive issue before the trial court and therefore remains moot as to proceedings in this court as well.