Dale "J.R." HEIDBREDER,
Petitioner, Appellant,

v.

Kathleen Jean CARTON, a/k/a
Katie Carton, a/k/a Kate
Carton, Respondent,

M.J.P., et al., Respondents.

No. C0–01–739.

Supreme Court of Minnesota.

June 13, 2002.

Mark A. Olson, Olson Law Office, Burnsville, for appellant.

Jill Alise Adkins, Rinke Noonan, et al., St. Cloud, for Carton, respondent.

Wright S. Walling, Walling & Berg, P.A., Minneapolis, for M.J.P. and M.B.P., respondents.

Cheryl Speeter Margoles, Speeter, Johnson, Hamilton & Wurst, Minneapolis, Laura Susan Arvold, Children's Home Society of Minnesota, St. Paul, for amicus curiae Children's Home Society.

Amy M. Silberberg, Afton, for amicus curiae for Lutheran Social Service.

## OPINION

RUSSELL A. ANDERSON, Justice.

Appellant Dale "J.R." Heidbreder, an Iowa resident, registered with the Minnesota Fathers' Adoption Registry 31 days after his former girlfriend Katie Carton gave birth to a girl, K.M.C. After registering, Heidbreder commenced a paternity action in Stearns County District Court in an attempt to block the pending adoption of K.M.C. in Minnesota. The prospective adoptive parents, respondents M.J.P. and M.B.P., intervened and moved to dismiss the paternity action under Minn. R. Civ. P. 12.03 on the grounds that Heidbreder's suit was barred under Minn.Stat. § 259.52, subd. 8 (2000), because Heidbreder was not entitled to notice of the adoption petition under Minn.Stat. § 259.49 (2000) and he failed to register with the Fathers' Adoption Registry within 30 days of K.M.C.'s birth. The district court treated the motion as a motion for summary judgment under Minn. R. Civ. P. 56. The district court granted respondents summary judgment and the court of appeals affirmed. We also affirm.

In November 1999, Carton, Heidbreder's girlfriend at the time, informed him that she was pregnant and due in August 2000. At the time, both lived in Fort Madison, Iowa. Carton was 18 years old and had graduated from high school in the spring of 1999. Heidbreder was a year older. According to Heidbreder, he and Carton had one discussion about adoption early in Carton's pregnancy. Carton expressed some interest in exploring adoption but Heidbreder told her he was "absolutely against" adoption and that he believed adoption was "not right." Heidbreder testified in his deposition that Carton told him she would "never ever" put his child up for adoption. While respondents dispute whether Carton made an affirmative promise to Heidbreder not to put the child up for adoption, we view the facts in the light most favorable to Heidbreder as the nonmoving party at the summary judgment stage and assume, for purposes of our decision, that Carton did in fact make such a promise to Heidbreder during their discussion of adoption.

In the spring of 2000, Carton moved out of her mother's house and went to Carthage, Illinois, for approximately 2 weeks. She then moved back to her mother's house. In June 2000, Carton and Heidbreder rented an apartment together in Fort Madison. Carton paid the security deposit and the rent for the month of

June. Heidbreder occasionally paid for meals for Carton, but he never provided financial support to Carton for pregnancy-related expenses.

While Carton and Heidbreder were living together, Carton learned that her mother was moving to Minnesota. Carton's relationship with her mother was strained because of the pregnancy and because Carton's mother believed Heidbreder did not treat Carton well. Carton told Heidbreder she would not move to Minnesota with her mother. However, Heidbreder knew Carton had other relatives living in Minnesota.

Carton and Heidbreder argued during the time they lived together. In mid-June, Carton decided to leave Heidbreder. Carton testified in her deposition that she left Heidbreder because they were not getting along. Heidbreder testified that he did not know why Carton left but that at the time she left, Carton was "scared and confused."

Carton moved to St. Cloud, Minnesota, and lived with her grandparents for a few days. She then moved to New Beginnings, a home for pregnant teenage girls in St. Cloud. Carton's mother moved to Minnesota in late June or early July.

While Carton maintained contact with Heidbreder through e-mail, she did not tell him where she was and she instructed her family and friends not to give Heidbreder any information about her location. Although Heidbreder asked for information, Carton's family and friends refused to tell him where Carton was. Heidbreder testified in his deposition that he believed Carton had returned to Illinois and he never considered the possibility that Carton was in Minnesota because of Carton's poor relationship with her mother.

According to Heidbreder, after Carton left he met with an attorney in Iowa to discuss visitation and child support. Heidbreder testified he did not discuss his rights in the event Carton put the child up for adoption because he did not believe Carton would do that. However, he also testified that the attorney told him that his child could not be adopted in Iowa without his consent. The attorney and Heidbreder considered hiring a private detective to find Carton, but never did so, and other than talking to Carton's family and friends, Heidbreder did not take any steps to locate Carton. Nor did Heidbreder take any steps to commence a paternity action, to register with the Iowa Declaration of Paternity Registry under Iowa Code § 144.12A (2001), or to learn whether the laws of Illinois—where Heidbreder believed Carton was—required him to do anything to preserve his parental rights.[1] Heidbreder explained in his deposition that he did not take any action after talking to the attorney because he and the attorney "figured [Carton] would * * * send [Heidbreder] papers."

While living at New Beginnings, Carton decided to give her child up for adoption. Through the Children's Home Society (CHS), Carton selected the couple she wanted to adopt K.M.C., respondents M.J.P. and M.B.P. During a meeting with a representative from CHS, Carton expressed concern that Heidbreder would stop the adoption. The representative ex-

---

**1.** Minnesota law regarding when putative fathers are entitled to notice of a pending adoption and when they are required to register with the state's adoption registry is almost identical to the law of Illinois. *See* 750 Ill. Comp. Stat. Ann. 50/7 (notice), 50/8 (consent), 50/12.1 (Illinois Putative Father Registry) (West 1999). As in Minnesota, a putative father not entitled to notice of an adoption petition has no right to make a claim to a child who is the subject of a petition for adoption in Illinois unless he registered with the Illinois Putative Father Registry before the child is more than 30 days old. *See id.*

plained to Carton that under Minnesota law, she was not required to name Heidbreder on the birth certificate and that if he was not named on the birth certificate, Heidbreder could not prevent the adoption unless he registered with the Minnesota Fathers' Adoption Registry no later than 30 days after the birth of the child.

Carton gave birth to a girl, K.M.C., on August 12, 2000. Carton did not identify a father on K.M.C.'s birth certificate and the space for identifying K.M.C.'s father was left blank. K.M.C. left the hospital with respondents on August 14, 2000, and respondents filed a petition to adopt K.M.C. in Washington County District Court.

On September 12, 2000, 31 days after K.M.C.'s birth, Heidbreder learned from a third party that Carton was in Minnesota, had given birth to a girl and had put her up for adoption. Heidbreder contacted Carton by e-mail. That night, Carton told Heidbreder over the telephone that she had given birth and had put the child up for adoption. She also told him it was too late for him to stop the adoption. The same day, Heidbreder found a website with information on the Minnesota Fathers' Adoption Registry and completed and mailed the necessary forms. The forms were postmarked September 12, 2000, 31 days after K.M.C.'s birth.

Heidbreder then commenced a paternity action in Stearns County District Court seeking a paternity adjudication and custody of K.M.C. Carton counterclaimed for custody in the event Heidbreder's attempt to block the adoption of K.M.C. was successful. Pursuant to a stipulation between Heidbreder, Carton, and respondents, the district court allowed respondents to intervene. Action on respondents' adoption petition was stayed pending resolution of Heidbreder's paternity action. K.M.C. has remained in respondents' care throughout these proceedings.

Respondents moved to dismiss Heidbreder's paternity action on the grounds that Minn.Stat. § 259.52, subd. 8, barred Heidbreder from asserting parental rights to K.M.C. because he failed to register with the Minnesota Fathers' Adoption Registry before K.M.C. was more than 30 days old and he was not otherwise entitled to notice of an adoption petition under Minn.Stat. § 259.49, subd. 1(b) (2000). Heidbreder argued that his failure to timely file should be excused because Carton engaged in fraud by failing to disclose her location. He also challenged the constitutionality of Minn.Stat. §§ 259.49 and 259.52.

The district court treated respondents' motion to dismiss as a motion for summary judgment under Minn. R. Civ. P. 56. *See* Minn. R. Civ. P. 12.03 (allowing district court to treat motion to dismiss as motion for summary judgment if matters outside the pleadings are presented). The district court granted respondents summary judgment.

The district court held that Heidbreder could not proceed with his paternity action because he was not entitled to notice of an adoption proceeding under any of the criteria listed in Minn.Stat. § 259.49, subd. 1(b), and he failed to timely register with the Minnesota Fathers' Adoption Registry under Minn.Stat. § 259.52. It concluded that Heidbreder's failure to timely register was not excused under Minn.Stat. § 259.52, subd. 8, because Heidbreder had not demonstrated by clear and convincing evidence that it was "not possible" for him to register before K.M.C. was more than 30 days old or that his failure to timely register was "through no fault of his own." The court concluded that it was possible for Heidbreder to timely register in Minnesota because he knew Carton was due in August 2000, knew she was hiding from him, and knew that there were a limited number of places where she could

be: in Iowa with her father, in Illinois where she lived in the spring of 2000, or in Minnesota where her mother and other family lived. The court concluded that because Heidbreder did not take steps to protect his rights in any of the states where Carton could have been, there was not clear and convincing evidence that it was "not possible" for Heidbreder to timely register or that his failure to register was "through no fault of his own."

The court also found that Carton had not engaged in any fraud that deprived Heidbreder of the opportunity to timely register in Minnesota and that Carton had no duty to disclose her location to him. Finally, the court held that Minn.Stat. §§ 259.49 and 259.52 did not violate due process or equal protection as applied to Heidbreder under the United States Supreme Court's decision in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

Heidbreder appealed and the court of appeals affirmed. We granted review to address Heidbreder's claims that (1) his failure to comply with the requirements of Minn.Stat. §§ 259.49 and 259.52 is excused due to fraud by Carton; (2) he should be permitted to pursue his paternity action because he substantially complied with Minn.Stat. § 259.52; (3) the deadline for registration with the Minnesota Fathers' Adoption Registry is a statute of limitations that is tolled by Carton's fraudulent concealment of her location; (4) equitable estoppel bars respondents and Carton from challenging the timeliness of his registration; and (5) Minn.Stat. §§ 259.49 and 259.52 as applied to Heidbreder violate due process and equal protection.

## I.

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 672 (Minn.2001). On appeal from summary judgment, the court determines whether there are any material issues of fact in dispute and whether the lower courts erred in their application of the law. *Id.*

## II.

Historically, most states, including Minnesota, did not recognize a putative father's[2] parental rights to a child and did not require that the putative father be given notice of the filing of a petition for adoption or that he consent to an adoption. *See* Minn.Stat. § 259.24, subd. 1(a) (1971); Comment, *The Emerging Constitutional Protection of the Putative Father's Parental Rights*, 70 Mich. L.Rev. 1581, 1581–84 (1972) (reviewing state laws concerning treatment of putative father's parental rights).

In 1972, the United States Supreme Court recognized that a putative father with an established relationship with his children has a liberty interest in the "companionship, care, custody, and management of his * * * children" and that this interest warrants protection absent a "powerful countervailing interest." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The court invalidated an Illinois statute that had the effect of presuming all putative fathers unfit to parent and rejected Illinois' assertion that because "most unmarried fathers

---

**2.** A "putative father" is a man who may be the child's father but who was not married to the birth mother on or before the date of birth and has not established paternity in a court proceeding. Minn.Stat. § 259.21, subd. 12 (2000).

are unsuitable and neglectful parents," it could deem *all* putative fathers unfit. *Id.* at 654, 92 S.Ct. 1208. The court held that Illinois' interest in convenience did not justify denying a putative father a hearing on his fitness. *Id.* at 656-57, 92 S.Ct. 1208.

Following *Stanley,* the Minnesota Legislature amended the adoption laws to recognize the rights of a putative father. Act of Feb. 21, 1974, ch. 66, §§ 1-10, 1974 Minn. Laws 89, 89-94; *see also In re Welfare of Larson,* 312 Minn. 210, 215 n. 3, 251 N.W.2d 325, 329 n. 3 (1977) (noting that legislature amended adoption laws to protect putative father's rights in response to *Stanley*). The legislature provided that the putative father was entitled to notice of an adoption proceeding if he (1) was named as a parent on the birth certificate, (2) substantially supported the child, (3) was married to the birth mother within 325 days before the child's birth or within 10 days after birth, (4) was openly living with the child or the person designated as the birth mother on the birth certificate, (5) had been adjudicated the child's parent, or (6) had filed an affidavit stating his intention to retain parental rights within 90 days of the child's birth or within 60 days of placement with the prospective adoptive parents, whichever was sooner, with the Department of Health's Division of Vital Statistics (the "90/60-day rule"). Minn.Stat. §§ 259.26, subd. 1, 259.261, subd. 1 (1974).[3] The legislature also provided that the putative father's consent to the adoption was required if the putative father was entitled to notice. Minn.Stat. § 259.24, subd. 1 (1974).

While the 1974 amendments protected a putative father's rights, they also had the adverse effect of jeopardizing the state's interest in permanence and stability in adoptions. For example, the court of ap-

peals held that a putative father's substantial compliance with the filing requirements entitled a putative father to notice of an adoption even though his affidavit was untimely filed with the Division of Vital Statistics. *In re Welfare of A.M.P.,* 507 N.W.2d 616, 621 (Minn.App.1993). While *A.M.P.* was the only case in which the court of appeals found that a putative father who failed to timely file an affidavit had substantially complied with the requirements for notice, adoptive parents could never be certain that a putative father would not appear after the time for filing an affidavit expired and successfully challenge the validity of the adoption on the grounds he substantially complied with the 90/60-day rule.

In addition, the fact that a putative father failed to file an affidavit did not bar a putative father from seeking to establish an interest in the child by commencing a paternity action before the adoption was final. In *In re Paternity of J.A.V.,* 547 N.W.2d 374, 376-79 (Minn.1996), we held that because the legislature did not specifically provide that the failure to timely file an affidavit barred a putative father from commencing an action to establish paternity, a putative father who failed to timely file an affidavit could pursue his parental rights through a paternity action. As a result, a putative father could thwart a pending adoption after the deadline for filing an affidavit of paternity expired by commencing a paternity action. We recognized in *J.A.V.* that our decision could lead to "inordinate delays and expense" in adoption proceedings, but concluded it was for the legislature, not the court, to address this issue. *Id.* at 379.

Following our decision in *J.A.V.,* the legislature amended the adoption laws to limit

---

**3.** These two statutes were later recodified at Minn.Stat. §§ 295.49 and 259.51 (1994). Act of May 10, 1994, ch. 631, § 31, 1994 Minn. Laws 1873, 1892.

a putative father's rights to a child that is the subject of a pending adoption petition. Act of May 30, 1997, ch. 218, §§ 7-9, 1997 Minn. Laws 2200, 2202-10.

The legislature continued to require that the putative father's consent to the adoption be obtained if the putative father is entitled to notice of the adoption. Minn. Stat. § 259.24, subd. 1 (2000). It also continued to require that notice of the adoption be given to any putative father who is named on the birth certificate, has substantially supported the child, has married the birth mother, is openly living with the child or the person designated as the natural mother on the child's birth certificate, or has been adjudicated a parent of the child. Minn.Stat. § 259.49, subd. 1(b) (2000). However, the legislature limited a putative father's right to thwart a pending adoption by commencing a paternity action. The legislature provided that a putative father who commences a paternity action is entitled to notice, and therefore may block the adoption by withholding consent, if he commences his paternity action "within 30 days after the child's birth and the action is still pending" at the time the adoption petition is filed. Minn.Stat. § 259.49, subd. 1(b)(6). The statute does not require that the putative father commence his paternity action in Minnesota. The legislature also eliminated the 90/60–day rule and replaced it with a provision that entitles a putative father to notice if he registers with the newly created Minnesota Fathers' Adoption Registry under Minn.Stat. § 259.52. Minn.Stat. § 259.49, subd. 1(b)(8).

Minnesota Statutes § 259.52 provides that *any* putative father may register with the Minnesota Fathers' Adoption Registry but requires that the putative father register no later than 30 days after the birth of the child in order to retain any interest in a child who is the subject of a pending adoption petition. Minn.Stat. § 259.52, subds. 6, 7 (2000).[4] If a putative father is not entitled to notice of a petition for adoption under Minn.Stat. § 259.49, subd. 1, and does not register with the Minnesota Fathers' Adoption Registry before the child is more than 30 days old, the putative father:

(1) is barred thereafter from bringing or maintaining an action to assert any interest in the child during the pending adoption proceeding concerning the child;

(2) is considered to have waived and surrendered any right to notice of any hearing in any judicial proceeding for adoption of the child, and consent of that person to the adoption of the child is not required; and

(3) is considered to have abandoned the child.

Minn.Stat. § 259.52, subd. 8.

The legislature limited the circumstances under which a court can excuse a putative father's failure to timely register. A putative father's failure to timely register is excused if he proves by clear and convincing evidence that:

(i) it was not possible for him to register within the period of time specified in subdivision 7;

(ii) his failure to register was through no fault of his own; and

(iii) he registered within 10 days after it became possible for him to file.

*Id.*

The legislature further limited a putative father's right to be excused from the

---

**4.** While this change gives a putative father less time after the birth of the child to protect his parental rights than the 90/60–day rule, a putative father may register upon knowledge of the possibility of conception, i.e. upon the occurrence of sexual intercourse. Thus, the putative father has up to 10 months (9 months of pregnancy plus 30 days) to register.

registration requirement by providing that "lack of knowledge of the pregnancy or birth is not an acceptable reason for failure to register." *Id.*

## III.

■ The issue in this case is whether Heidbreder's paternity action must be dismissed due to his failure to register with the Minnesota Fathers' Adoption Registry before K.M.C. was more than 30 days old. Heidbreder is barred under Minn.Stat. § 259.52, subd. 8, from maintaining his paternity action unless (1) he was entitled to notice of the adoption under Minn.Stat. § 259.49, subd. 1, (2) he timely registered with the Minnesota Fathers' Adoption Registry, or (3) his failure to timely register is excused under Minn.Stat. § 259.52, subd. 8.

■ Heidbreder admits he does not meet any of the criteria for notice of the adoption under Minn.Stat. § 259.49, subd. 1(b).[5] He argues, however, that he should be "deemed" entitled to notice because he would have been named on the birth certificate but for "fraudulent collusion" by Carton and CHS and because he would have timely commenced a paternity action had Carton revealed her location. This argu-

ment is without merit. There is no basis in the language of Minn.Stat. § 259.49, subd. 1(b), for expanding the categories of putative fathers entitled to notice beyond those specifically listed.[6]

■ Heidbreder concedes that his registration, filed one day late, was untimely. He argues that his failure to timely register should be excused because it was "not possible" for him to timely register and that his failure to timely register was "through no fault of his own" under Minn. Stat. § 259.52, subd. 8(i)-(iii). He asserts that it was "not possible" for him to register in Minnesota because Carton concealed her location and he did not know she was in Minnesota.

■ The legislature specifically provided that lack of knowledge of pregnancy or birth would not excuse a putative father's failure to timely register. Minn.Stat. § 259.52, subd. 8. It is apparent from this statutory language that the legislature intended not to excuse an untimely registration based on concealment of the fact of pregnancy or birth by the birth mother even if the concealment made it "not possible" for the putative father to timely register and his failure to timely register was

---

**5.** The court of appeals held that Heidbreder was not entitled to notice under Minn.Stat. § 259.49, subd. 1(b)(4), which requires notice to a person who "is openly living with the child or the person designated on the birth certificate as the natural mother of the child or both," because this provision requires notice only to a putative father who lived or is living with the child, birth mother, or both after the birth of the child. *Heidbreder v. Carton,* 636 N.W.2d 833, 837 (Minn.App. 2001). On appeal to this court, Heidbreder has abandoned his argument that he was entitled to notice because he openly lived with Carton for a few weeks during Carton's pregnancy.

**6.** We also note that there is no evidence indicating that CHS engaged in any fraudulent

conduct. The record indicates that CHS did nothing more than tell Carton she was not legally required to identify a father on the birth certificate but that if she named a father he would be entitled to notice of the adoption. CHS merely informed Carton of the law in Minnesota and allowed her to make her own decision about whether to name Heidbreder on the birth certificate.

In addition, Carton's failure to disclose her location did not prevent Heidbreder from timely commencing a paternity action because Heidbreder knew at the time Carton left that she was pregnant, and he does not assert that he could not have filed a paternity action in Iowa or in Illinois—where he believed Carton was—to protect his interests in K.M.C. without knowing Carton's location.

"through no fault of his own." It follows that concealment by the birth mother of facts related to the pregnancy or birth, such as her location during pregnancy or at the time of birth, would also not excuse a putative father's failure to timely register even if he otherwise met the requirements of Minn.Stat. § 259.52, subd. 8(i)-(iii). Therefore, the fact that Carton concealed her location from Heidbreder does not excuse his failure to timely register with the Minnesota Fathers' Adoption Registry.

Heidbreder characterizes Carton's concealment as "fraud" and asserts that this excuses his failure to timely register because Carton's "fraud" made it "not possible" for him to timely register and made his failure to register "no fault of his own" under Minn.Stat. § 259.52, subd. 8.

We need not resolve the question of whether fraud by the birth mother excuses a putative father's failure to timely register under Minn.Stat. § 259.52 because Heidbreder cannot, as a matter of law, establish that Carton engaged in fraud.

█ To establish fraud, a plaintiff must demonstrate:

[T]hat [the] defendant (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation [and] (10) that the plaintiff suffered damages (11) attributable to the misrepresentation.

*M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn.1992). A misrepresentation may be made by an affirmative statement that is itself false or by concealing or not disclosing certain facts that render facts disclosed misleading. *Id.*

█ Carton's statements that she would "never ever" choose adoption and would not move to Minnesota with her mother fail to satisfy at least three elements of fraud. First, the statements concern future facts—adoption and moving to Minnesota—not past or present facts. Second, there is no evidence that at the time Carton made these statements she knew they were false. Heidbreder has presented no evidence that Carton intended to put the child up for adoption or that Carton intended to move to Minnesota when she told him she would not do either of these things. Carton testified that she moved to Minnesota on the "spur of the moment" and that she decided to put the child up for adoption after moving to Minnesota. The record does not support the conclusion that Carton knew her statements were untrue at the time she made them. Finally, there is no evidence that Carton made these statements intending to prevent Heidbreder from exercising his rights as the putative father or to induce him not to protect himself in the event she placed the child up for adoption. Thus, Heidbreder's claim that Carton committed fraud fails as a matter of law.

█ Heidbreder's claim that Carton engaged in fraudulent nondisclosure also fails as a matter of law. Nondisclosure does not give rise to a fraud claim unless there is "a legal or equitable obligation" to communicate facts to a particular person and that person is entitled to the information. *L & H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn.1989). A duty to disclose facts may exist when a fiduciary relationship exists between the parties or when disclosure would be necessary to clarify information already disclosed. *Id.*

█ Heidbreder does not assert that Carton had a duty to clarify her prior

statements that she would not put the child up for adoption and would not move to Minnesota. Rather, he asks the court to hold that Carton, as the mother of his unborn child, owed him a fiduciary duty to disclose her location because her nondisclosure prevented him from protecting his interest in K.M.C. as a putative father. At oral argument, Heidbreder's attorney clarified when the fiduciary duty on the birth mother to disclose her location should attach. He stated that the fiduciary duty should not attach based solely on the occurrence of sexual intercourse and a resulting pregnancy. Rather, he asked us to hold that a fiduciary duty attaches at the time of birth and that upon giving birth, the birth mother is required to disclose her location to a putative father whom she knows is attempting to locate her.

We decline to impose a fiduciary duty on an unmarried birth mother to disclose her location to the putative father even if she knows he wants to know her location or establish a relationship with his child. We are not aware of any court that has imposed such a fiduciary duty on an unmarried birth mother to the putative father. There are numerous situations in which an unmarried birth mother would be justified in keeping information from a putative father, including situations where the woman has fled an abusive relationship, where the pregnancy was the result of nonconsensual intercourse, or where the putative father poses a danger to the child.

Furthermore, there is no need to impose such a duty on the birth mother in the interest of protecting a putative father's interests because the legislature has provided a means for the putative father to assert his interest in his child independent of the birth mother through registration with the Minnesota Fathers' Adoption Registry. Because a putative father is able to protect his interest in his child without any assistance or information from the birth mother, the birth mother is not in a position superior to the putative father such that she should be required to provide him with information regarding her location.

Because we decline to impose a fiduciary duty on a birth mother to notify a putative father of her location at the time of birth, Carton had no duty to disclose her location to Heidbreder, and thus Heidbreder's claim of fraudulent nondisclosure fails as a matter of law.

In the absence of evidence to support a finding of fraud or fraudulent nondisclosure, there is no reason to address whether either would make it "not possible" for a putative father to register or make the putative father's failure to register "no fault of his own" under Minn.Stat. § 259.52, subd. 8(i)-(ii).

Because the legislature has provided that lack of knowledge of pregnancy or birth does not excuse a putative father's failure to timely register, it is clear that the legislature intended to foreclose the argument that the birth mother's concealment of any information relating to the pregnancy or birth, including her location during pregnancy or at the time of birth, excuses a putative father's failure to register, regardless of whether the concealment made it "not possible" for the putative father to timely register and his failure to timely register "no fault of his own."[7]

---

**7.** The dissent asserts that the "bald assertions" contained in this statement have no basis in law or fact. However, in interpreting a statute, we must presume that the legislature did not intend an absurd result. Minn. Stat. § 645.17(1) (2000). It would be absurd to conclude that a putative father who knew of the pregnancy but did not know the birth mother's location is entitled to greater protection under the statute than a putative father

Therefore, Heidbreder's failure to timely register cannot be excused under Minn. Stat. § 259.52, subd. 8, based on Carton's concealment of her location. Because Carton did not engage in fraud, there is no need to address whether fraud by the birth mother could excuse a putative father's failure to timely register with the Minnesota Fathers' Adoption Registry.

## IV.

Heidbreder argues that his registration with the Minnesota Fathers' Adoption Registry should be deemed timely because he substantially complied with the statute.

In the 1950s, we stated in two cases that deficiencies in an adoption proceeding would not bar approval of an adoption if the party petitioning for adoption substantially complied with the statutory requirements. *See In re Petition of Jordet*, 248 Minn. 433, 439, 80 N.W.2d 642, 646 (1957); *In re Adoption of Anderson*, 235 Minn. 192, 197, 50 N.W.2d 278, 283 (1951). Relying on these decisions, the court of appeals recognized a substantial compliance exception to the former 90/60-day rule. *See A.M.P.*, 507 N.W.2d at 621. We have never addressed whether a putative father is entitled to notice if he substantially complied with the statutory requirements for registration with the Minnesota Fathers' Adoption Registry.

■ We decline to carve out a substantial compliance exception to the statutory requirement that a putative father not otherwise entitled to notice of petition for adoption under Minn.Stat. § 259.49, subd. 1, must register with the Minnesota Fa-

thers' Adoption Registry no later than 30 days after the birth of the child in order to assert an interest in a child who is the subject of a petition for adoption. The legislature created the Minnesota Fathers' Adoption Registry after the court of appeals' decision in *A.M.P.* but did not include a substantial compliance exception. The legislature's decision to excuse a putative father's failure to timely register only if he can establish by "clear and convincing evidence" that it was "not possible" for him to have timely registered and that his failure to register was "through no fault of his own," indicates that the legislature did not want untimely registration to be excused based on the putative father's substantial compliance with the registration deadline.

■ We agree with Heidbreder that the purpose of the Minnesota Fathers' Adoption Registry is to provide a mechanism for identifying putative fathers and giving them notice of adoption proceedings. *See* Minn.Stat. § 259.52, subd. 1. However, adoption registries are also intended to balance the putative father's interests with those of the child, the birth mother, and adoptive parents. *See In re Petition of K.J.R.*, 293 Ill.App.3d 49, 227 Ill.Dec. 190, 687 N.E.2d 113, 117 (1997). Adoption registries serve the interests of the child and adoptive parents by establishing a clear cut-off date after which there is little risk that a putative father who has failed to timely register and who is not otherwise entitled to notice can disrupt the adoptive placement.[8] While recognizing a substantial compliance ex-

---

who is ignorant of both the pregnancy and the birth mother's location.

**8.** In addition to serving the interests of a child who is adopted, the Minnesota Fathers' Adoption Registry also serves the interests of a child who is raised by her birth mother because it allows a public authority responsible

for enforcing child support to have the registry searched to determine whether "a putative father is registered in relation to [the] child who is or may be the subject of a child support obligation." Minn.Stat. § 259.52, subd. 3 (2000).

ception would benefit putative fathers who fail to timely register, such an exception would also weaken the permanence and stability adoption registries give adopted children.

In enacting Minn.Stat. § 259.52, the legislature has decided that a putative father must act promptly to assert his interest in a child. We recognize that Heidbreder's registration was only one day late. However, under the statute, Heidbreder's registration cannot be treated any differently than a registration that is one week, one month, one year, or one decade late. The state cannot give a putative father an infinite amount of time to claim an interest in the child. At some point, the putative father's interest in knowing and raising his child gives way to the child's interest in having a permanent and stable home. While the deadline here may seem unjustly short to the putative father who misses the deadline, the period is justified by the need for early permanent and stable placement. No matter how much time the legislature provides for registration, the possibility that a putative father will miss the deadline by one day can never be eliminated. We will not undermine the legislature's determination that a putative father not otherwise entitled to notice of an adoption proceeding under Minn.Stat. § 259.49, subd. 1, must register within 30 days of the child's birth to protect his interests by recognizing a substantial compliance exception for a putative father who misses the statutory deadline but claims his registration should nonetheless be recognized because he acted promptly upon learning of the need to register.

To conclude that [the putative father] acted promptly once he became aware of the child is to fundamentally misconstrue whose timetable is relevant. Promptness is measured in terms of the baby's life not by the onset of the father's awareness. The demand for prompt action by the father at the child's birth is neither arbitrary nor punitive, but instead a logical and necessary outgrowth of the State's legitimate interest in the child's need for early permanence and stability.

*Robert O. v. Russell K.*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99, 103–04 (1992).

Because creating a substantial compliance exception would defeat one of the purposes of the Minnesota Fathers' Adoption Registry—permanent and stable adoptive placements—we hold that substantial compliance with the registration requirements does not excuse a putative father's failure to timely register.

### V.

We also reject Heidbreder's claim that the registration deadline of 30 days after birth in Minn.Stat. § 259.52, subd. 7, is a statute of limitations that can be tolled by fraudulent concealment. Generally, a statute of limitations affects a party's remedy not his right. *See State ex rel. Moser v. Kaml*, 181 Minn. 523, 527, 233 N.W. 802, 804 (1930). Here, Minn.Stat. § 259.52 does not provide any remedy to a putative father but rather terminates a putative father's substantive rights to a child who is the subject of an adoption petition if he fails to timely register. Minn.Stat. § 259.52, subd. 8. Therefore, the registration deadline is not a statute of limitations.

Even if we were to treat the registration deadline as a statute of limitations that could be tolled by fraudulent concealment, Heidbreder would not be entitled to relief because Carton had no duty to inform Heidbreder of her location or otherwise assist him in protecting his rights. *See Lehr*, 463 U.S. at 265 n. 23, 103 S.Ct. 2985 (noting that "[i]t is a generally accepted feature of our adversary system

that a potential defendant who knows that the statute of limitations is about to run has no duty to give the plaintiff advice").

## VI.

Heidbreder also argues that promissory estoppel bars respondents and Carton from seeking dismissal of his paternity action because Carton promised him she would "never ever" put his child up for adoption. He also contends that respondents and Carton are barred from opposing equitable relief because Carton has "unclean hands."

 A party seeking to invoke the doctrine of equitable or promissory estoppel has the burden of proving (1) that promises or inducements were made; (2) that he reasonably relied upon the promises; and (3) that he will be harmed if estoppel is not applied. *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn.1990). We assume, as we must in reviewing summary judgment, that Carton promised Heidbreder she would never put the child up for adoption. Nonetheless, Heidbreder's promissory estoppel claim fails because we conclude that, as a matter of law, it was unreasonable for Heidbreder to rely on Carton's promise after she left him. *See Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn.1995) (recognizing that summary judgment is appropriate on promissory estoppel claim if plaintiff's reliance on alleged promise was unreasonable as a matter of law).

 Carton effectively ended her romantic relationship with Heidbreder when she moved to Minnesota and refused to tell him where she was.[9] Once that relationship ended, Heidbreder could not reason-ably expect that Carton, who as far as he knew would be raising the child alone, would not reconsider her promise not to put the child up for adoption. Heidbreder was aware that Carton had suggested the possibility of adoption and that her promise not to put the child up for adoption was made after he told her he was "absolutely against" adoption because it is "not right." Heidbreder also believed Carton was "scared and confused" when she left him. Under these circumstances, Heidbreder could not reasonably believe that a "scared and confused" Carton would not reconsider adoption after she ended their relationship, moved away, and refused to reveal her location. Indeed, such actions by a birth mother, if anything, are consistent with a birth mother's decision to put her child up for adoption without interference from the putative father and would put a putative father on notice of the need to protect his rights.

 Heidbreder argues that respondents and Carton cannot oppose equitable relief because Carton acted with "unclean hands." The doctrine of "unclean hands" bars a party who acted inequitably from obtaining equitable relief. *See Gully v. Gully*, 599 N.W.2d 814, 825 (Minn.1999). It does not bar a party with "unclean hands" from opposing a request for equitable relief by the other side. Here, it is Heidbreder, not respondents, seeking equitable relief and it is irrelevant whether anyone other than Heidbreder acted with "unclean hands." Therefore, we do not need to address whether Carton, while not engaging in any fraud, acted with "unclean hands" such that respondents would not be entitled to equitable relief if they were seeking such relief.[10]

---

**9.** While Carton maintained contact with Heidbreder via e-mail, Heidbreder does not assert that he and Carton were still romantically involved or that Carton ever indicated she wanted to continue their relationship after she left.

**10.** It is not clear to us that even if respondents were seeking equitable relief and Car-

## VII.

We now turn to Heidbreder's constitutional arguments that Minn.Stat. §§ 259.49 and 259.52 violate due process and equal protection as applied to him because they deprived him of his parental rights and gave Carton greater rights in the adoption proceeding than him.

The constitutionality of a statute is question of law that is reviewed de novo on appeal. *Associated Builders & Contractors v. Ventura,* 610 N.W.2d 293, 298 (Minn.2000). Statutes are presumed to be constitutional and the party challenging the constitutionality of a statute "must meet the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional." *Id.* at 299.

### A. *Procedural Due Process*

A person may not allege a procedural due process violation unless the person has a protected property or liberty interest at stake. *State v. Mitchell,* 577 N.W.2d 481, 492 (Minn.1998). Heidbreder argues that he has a protected liberty interest in having a relationship with K.M.C. because he is her biological father.[11] However, the mere existence of a biological connection between a child and a putative father does not confer due process protection on the putative father's parental interests. *Lehr,* 463 U.S. at 260-61, 103 S.Ct. 2985 (citing *Caban v. Mohammed,* 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (Stewart, J., dissenting)). A putative father's interest in knowing his child is entitled to due process

protection only when the father "demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child.'" *Lehr,* 463 U.S. at 261, 103 S.Ct. 2985 (quoting *Caban,* 441 U.S. at 392, 99 S.Ct. 1760). While the Court has never addressed the degree of involvement a putative father must have to demonstrate "a full commitment" to the responsibilities of parenthood, it has recognized that a putative father could demonstrate the required commitment if he has a "significant custodial, personal, or financial relationship" with the child. *Lehr,* 463 U.S. at 262, 103 S.Ct. 2985.

Here, Heidbreder is not entitled to due process protection of his interest in K.M.C. because he does not have a custodial, personal or financial relationship with K.M.C. Heidbreder never had a custodial right to K.M.C. *See* Minn.Stat. § 257.541, subd. 1 (2000) (providing that birth mother who is not married to child's father at time of conception or birth has sole custody of child until paternity is established in a judicial proceeding). In addition, there is no evidence in the record that would support a conclusion that Heidbreder had a personal relationship with K.M.C. The record is also void of any evidence that Heidbreder provided, or attempted to provide, financial support to Carton during her pregnancy or to K.M.C. following her birth. Therefore, due process does not require recognition of Heid-

---

ton had "unclean hands" that it is appropriate to deny prospective adoptive parents equitable relief based on the conduct of the birth mother. The interests of the birth mother and adoptive parents are not always aligned as they are here and there may be situations in which it would be unjust to deny adoptive parents equitable relief based on the conduct of the birth mother. How-

ever, we do not need to address the issue here because respondents seek legal rather than equitable relief.

**11.** Although the parties do not dispute that Heidbreder is K.M.C.'s biological father, he has never been adjudicated the biological father of K.M.C.

breder's interest in K.M.C. as a putative father.[12]

■ Because Heidbreder did not have an established relationship with K.M.C., the only due process issue is whether the state "has adequately protected his opportunity to form such a relationship." *Lehr*, 463 U.S. at 262-63, 103 S.Ct. 2985.

In *Lehr*, the Court rejected a due process challenge to a New York statutory scheme similar to our own that required notice of an adoption petition to a putative father only if the putative father fell into one of seven categories, which included putative fathers who had registered with New York's adoption registry. The Court concluded that the statutory scheme adequately protected a putative father's opportunity to establish a relationship with his child because the statutory procedure was unlikely to omit most responsible fathers and did not place "qualification for notice * * * beyond the control of an interested putative father." *Lehr*, 463 U.S. at 264, 103 S.Ct. 2985. The Court found no due process violation even though the scheme denied a putative father who had expressed, belatedly, an interest in his child because:

> [T]he right to receive notice was completely within appellant's control. By mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceeding to adopt Jessica. The possibility that he may have failed to do so because of his ignorance of the law cannot be a sufficient reason for criticizing the law itself. The New York Legislature concluded that a more open-ended notice requirement would merely complicate the adoption process, threaten the privacy interests of unwed mothers, create the risk of unnecessary controversy, and impair the desired finality of adoption decrees.

*Id.* at 264, 103 S.Ct. 2985 (footnote omitted).

The Court also rejected the putative father's claim that even if the statutory scheme adequately protected a putative

---

**12.** The dissent concludes that Heidbreder demonstrated a sufficient commitment to K.M.C. entitling him to due process protection because he "did nothing to avoid the responsibilities of parenthood." However, a putative father does not acquire a protected liberty interest in his child by merely failing to do anything to avoid his parental responsibilities. A putative father must affirmatively demonstrate a commitment to such responsibilities.

> [A]n unwed father's right to a continued parental relationship [is defined] by his manifestation of parental responsibility. * * * [W]e take this to mean that the qualifying interest of an unwed father requires a willingness himself to assume full custody of the child—not merely to block adoption by others.

*In re Raquel Marie X.*, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418, 428 (1990).

The dissent interprets Heidbreder's actions in telling Carton he would support her but would not support adoption, in living with Carton for only a few weeks, maintaining contact with Carton through e-mail, consulting an attorney, and trying to locate her indicates an intent to rear the child. We disagree.

Heidbreder's actions do not unequivocally indicate an intent to assume full custody of K.M.C. Rather, his actions (and inaction in failing to take any steps to obtain visitation or to ensure that the child received financial support from him) are equally consistent with those of a putative father who does not want his child adopted because he believes adoption is "not right" but intends to avoid assuming the responsibility of providing for the child's emotional and financial needs by simply waiting for the birth mother to "send [him] papers." While Heidbreder may have sincerely wanted a relationship with K.M.C. before she was more than 30 days old, his actions do not demonstrate a commitment to the responsibilities associated with that relationship such that due process requires that he be given a voice in K.M.C.'s future.

father's opportunity to establish a relationship with his child in the "normal case," he was nonetheless entitled to "special notice" because the trial court and birth mother "knew that he had filed an affiliation proceeding in another court." *Id.* at 264-65, 103 S.Ct. 2985. The Court stated:

> This argument amounts to nothing more than an indirect attack on the notice provisions of the New York statute. The legitimate state interests in facilitating the adoption of young children and having the adoption proceeding completed expeditiously that underlie the entire statutory scheme also justify a trial judge's determination to require all interested parties to adhere precisely to the procedural requirements of the statute. The Constitution does not require either a trial judge or a litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights. Since the New York statutes adequately protected appellant's inchoate interest in establishing a relationship with Jessica, we find no merit in the claim that his constitutional rights were offended because the Family Court strictly complied with the notice provisions of the statute.

*Id.* at 265, 103 S.Ct. 2985 (footnote omitted).

Heidbreder argues that the requirement that he register with the Minnesota Fathers' Adoption Registry before K.M.C. was more than 30 days old to protect his interests as a putative father is inadequate because he did not know Carton was in Minnesota, he did not know Minnesota law required him to register, and he was not required to do anything under Iowa law to receive notice of termination of his parental rights and pending adoption of his child in Iowa. However, the issue here is not whether one part of the statutory scheme—the Minnesota Fathers' Adoption Registry—adequately protected Heidbreder's interests, but whether the entire scheme adopted by the legislature adequately protected Heidbreder's opportunity to form a relationship with K.M.C. We conclude that the statutes, as applied to Heidbreder, adequately protected his opportunity to establish a relationship with K.M.C.

The statutory scheme here is almost identical to the statutory scheme upheld in *Lehr.* The only material factual distinction between the two cases is that here the putative father is not a resident of the state in which he was required to register. However, the fact that Heidbreder is not a Minnesota resident does not make the statutory scheme unconstitutional as applied to him because the scheme is not "likely to omit many responsible fathers" who live outside of Minnesota and "qualification for notice [is] not beyond the control of an interest putative father" living outside the state, *Lehr,* 463 U.S. at 264, 103 S.Ct. 2985.[13]

---

**13.** The dissent concludes that *Lehr* is inapplicable here because unlike the putative father in *Lehr,* Heidbreder did not wait 2 years to establish a relationship with the child and Heidbreder "tried at every turn to grasp the opportunity to develop a relationship with his offspring and accept some measure of responsibility for his child's future." However, *Lehr* controls our decision because the issue here is not whether Heidbreder tried to grasp the opportunity to develop a relationship with K.M.C. at some point in her life, but rather whether the state provided Heidbreder a sufficient opportunity to develop a relationship with K.M.C. that would be entitled to due process protection. While the legislature could have included other categories of putative fathers among those entitled to notice of an adoption proceeding—including putative fathers who live with the birth mother at some point during the pregnancy or who express opposition to adoption—there is no basis for concluding that due process *requires* notice to these categories of putative fathers. Our statutory scheme requires notice to the

In addition to registering with the Minnesota Fathers' Adoption Registry, a non-resident putative father can ensure that his parental rights are not terminated under Minn.Stat. § 259.52, subd. 8, by commencing a paternity action. *See* Minn. Stat. § 259.49, subd. 1(b)(6) (2000). There is no requirement in Minn.Stat. § 259.49, subd. 1(b)(6), that the paternity action be commenced in Minnesota. Therefore, a putative father may protect his interest in a child by commencing a paternity action in his own state before the child is more than 30 days old.

Furthermore, even though Heidbreder is an Iowa resident, Minnesota law did not foreclose his opportunity to establish the required relationship with K.M.C. Heid-

breder knew or had sufficient reason to believe that Carton was not in Iowa. Therefore, it was not reasonable for him to assume he could rely exclusively on the provisions of Iowa law to protect his interests. Under the circumstances, Heidbreder could have done more than simply assume Carton "would * * * send [him] papers." Heidbreder had opportunities under Iowa law to establish a sufficient commitment. He could have registered with the Iowa Declaration of Paternity Registry or commenced a paternity action in Iowa.[14] In addition, while Heidbreder did not know with certainty where Carton was, he had sufficient information to put him on notice that it was possible she was in Illinois or Minnesota.[15] Both Illinois

same categories of putative fathers who were entitled to notice under the statutory scheme upheld in *Lehr*. While the dissent would like the legislature to do more to protect a putative father's rights, the legislature has provided all the due process protection required under the Court's decision in *Lehr*.

Furthermore, we disagree with the dissent's conclusion that Heidbreder has "grasp[ed] the opportunity" to demonstrate a commitment to the responsibilities of parenthood. During Carton's pregnancy and up until 31 days after K.M.C.'s birth, the only things Heidbreder arguably did in an effort to establish a relationship with his offspring was asking Carton and her family and friends about her location and meeting with an attorney. Merely asking about Carton's location does not indicate an intent to assume the responsibilities of parenthood. Similarly, Heidbreder's discussions with an attorney do not indicate an intent to assume such responsibilities. After meeting with the attorney, Heidbreder decided, for whatever reason, not to avail himself of the legal opportunities available to him to establish a relationship with K.M.C. Rather, Heidbreder chose to do nothing and wait for Carton to send him papers. Based on these facts, we disagree with dissent's conclusion that Heidbreder "grasp[ed] the opportunity" to demonstrate a full commitment to K.M.C.

**14.** A putative father may commence a paternity action in Iowa according to the same

procedure applicable to a paternity action brought by the birth mother. *See* Iowa Code § 600B.7 (2001). A birth mother may commence a paternity action during the pregnancy. Iowa Code § 600B.9 (2001).

**15.** The dissent asserts that our conclusion that Heidbreder had sufficient information to be on notice that Carton could be in Minnesota or Illinois is "speculative, at best," and "simplistic" in light of the ease and frequency with which people now move from state to state. We disagree.

Our conclusion that Heidbreder was on notice that Carton could be in Minnesota or Illinois is based on the information Heidbreder knew or believed. Heidbreder knew Carton had relatives in Minnesota and that her mother was moving to Minnesota. While Heidbreder knew Carton's relationship with her mother was strained and Carton told Heidbreder she would not move to Minnesota with her mother, it is reasonable to recognize that there was at least the possibility that a pregnant "scared and confused" 18 year old woman might request assistance from her mother or out-of-state relatives for assistance if she did not want the birth father to know her location. In addition, Heidbreder knew that Carton had gone to Illinois earlier in the pregnancy and he testified that he believed Carton was in Illinois. In light of Heidbreder's testimony and other facts he knew about Carton's contacts with Illinois, imputing no-

and Minnesota provided Heidbreder with the opportunity to establish a commitment. Heidbreder could have commenced a paternity action in either state or registered with the adoption registries provided by both states. Any of the above options would have put Heidbreder in a position to argue he established a sufficient commitment to warrant due process protection.[16] Therefore, as applied to the circumstances of this case, Minn.Stat. §§ 259.49 and 259.52 adequately protected Heidbreder's opportunity to establish the required commitment necessary for due process protection to arise.

That the statutes could provide more time or greater opportunity for the putative father to establish the required relationship is a policy decision that is left to the legislature. The Court recognized in *Lehr* that the legislature may require strict adherence to statutory procedures as long as the statute satisfies due process constraints. 463 U.S. at 265, 103 S.Ct. 2985. The Minnesota Legislature has made policy choices similar to those made by the New York Legislature at issue in *Lehr*. Because the statutes provide adequate notice and opportunity to be heard to someone who has established a sufficient relationship to create a protected liberty interest and also adequately protected Heidbreder's opportunity to create

such a relationship, the statutes satisfy due process requirements.

B. *Equal Protection.*

Heidbreder claims that Minn. Stat. §§ 259.49 and 259.52 violate equal protection as applied to him because Carton receives more favorable treatment under the statutes than he in the proceeding for the adoption of K.M.C. This argument is without merit. It is well established that the state can treat unmarried parents differently with respect to their rights in an adoption proceeding based on each parent's relationship to the child. *Lehr*, 463 U.S. at 267–68, 103 S.Ct. 2985. Equal protection does not prohibit the state from treating a birth mother with an established custodial relationship with the child more favorably than a putative father who does not have an established relationship. *Id.* As the birth mother, Carton had an established custodial relationship with K.M.C. under Minnesota law. *See* Minn.Stat. § 257.541, subd. 1. In contrast, Heidbreder did not have an established relationship with K.M.C., nor did he avail himself of the opportunities provided to him to establish such a relationship. Under these circumstances, Carton and Heidbreder were not similarly situated with respect to their relationship to K.M.C., and equal protection does not require the legislature to give Heidbreder the same opportunity as Car-

tice to him that Carton could be in Illinois cannot be labeled "speculative."

The fact that people move from state to state only buttresses our conclusion that the fact Carton had moved out of state does not excuse Heidbreder's failure to register. Because people move from state to state with ease and frequency, Heidbreder could not reasonably assume that Carton would stay in Iowa. This is especially true in light of the fact that Heidbreder knew Carton had relatives in Minnesota and contacts in Illinois, and knew that she did not want Heidbreder to know where she was.

16. We note that registration with another state's registry does not entitle a putative father to notice under Minn.Stat. §§ 259.49 or 259.52. If registration with an adoption registry in any state is, by itself, sufficient to demonstrate a substantial commitment to the child, then arguably a putative father is entitled to due process protection regardless of whether state law recognizes such registration. We need not address the issue here because we are not presented with a situation in which a putative father registered with another state's registry.

ton to voice an opinion about K.M.C.'s best interests or to block the adoption by withholding consent.

## VIII.

The dissent asserts that in our "arrogance" we have foreclosed the possibility that the best interests of the child can be met by having a permanent and stable relationship with the child's biological father. The legislature has concluded, however, that a child's best interests will be served in an adoption proceeding if the rights of any putative father not entitled to notice of her adoption under Minn.Stat. § 259.49 are terminated unless the putative father registered with the Minnesota Fathers' Adoption Registry before the child is more than 30 days old or the putative father's failure to register is excused under Minn.Stat. § 259.52, subd. 8(i)-(iii). Our decision today is not made in arrogance, but rather in deference to the legislature's determination of when a child's interest in permanence and stability in an adoptive placement takes priority over any interest a putative father has in establishing a relationship with the child. The legislature has carefully balanced the different interests of the child and putative father, and its decision, as applied to Heidbreder, does not violate the constitution. Under these circumstances, nothing would be more arrogant than for us to disregard the legislature's decision concerning the best interests of a child out of a desire to give a putative father time beyond that prescribed by the legislature to assert an interest in a child.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent because the court's decision (1) improperly applies Minn.Stat. § 259.52, subd. 8 (2000), to the facts of this case and (2) as a result violates Heidbreder's right to due process.

Before and during the majority of Carton's pregnancy, Heidbreder and Carton lived in Iowa. At that time, Heidbreder was 19 and Carton was 18. At some point during the early stages of Carton's pregnancy, Heidbreder and Carton discussed adoption, and Heidbreder unequivocally stated that he was opposed to the idea. Carton agreed that she would not place the child up for adoption. Eventually, Heidbreder and Carton tried living together, which they did for a short period. Ultimately, Heidbreder and Carton separated because, according to Carton, she and Heidbreder could not get along.[1]

Upon separating, Carton left Iowa and moved to Minnesota, living in various places. She did not tell Heidbreder where she moved. She moved to Minnesota, living first with her grandparents in St. Cloud and then at a home for unwed pregnant teenagers. Carton and Heidbreder maintained contact via e-mail but she continued to refuse to tell him where she was. Carton also directed her family and friends not to reveal her whereabouts to Heidbreder. Heidbreder attempted to find Carton by asking her relatives and friends where she was, but they refused to tell him anything. In addition, Heidbreder attempted to contact Carton's grandparents in Minnesota to ask them where Carton

---

1. The court states, "Carton and Heidbreder argued during the time they lived together." While accurate, it seems that the court's motive in pointing this out is to suggest that, because they argued, Heidbreder engaged in conduct making him either unfit to parent or unwilling to parent his child. The record does not, however, support the conclusion that he is either unfit or unwilling to do so. Moreover, the fact that Heidbreder and Carton argued and could not get along does not support the conclusion that Heidbreder's failure to register within 30 days after birth was not excused.

might be, but was unable to do so because he did not know the grandparent's last name and people who knew would not tell him.

The record indicates that, in an effort to protect his rights, Heidbreder consulted an attorney in Iowa to discuss "setting up child support payments and visitation rights." Heidbreder Dep. Tr. at 37. Heidbreder told the attorney that he did not believe that Carton would consider adoption for their child and, therefore, the two did not discuss Heidbreder's parental rights in that context. The attorney told Heidbreder that, in any event, his consent was necessary for adoption under Iowa law. Heidbreder and the attorney considered hiring a private investigator to locate Carton, but did not do so. Heidbreder and the attorney also considered instituting a paternity action, but Heidbreder testified that, because they did not know where Carton was, the attorney was unsure of where to commence such an action. Heidbreder and the attorney decided to wait for Carton to contact them with information about her location.

Carton began adoption proceedings with the Children's Home Society (CHS) while at the home for pregnant teenagers. Carton told a CHS representative that she knew Heidbreder would not want her to go through with the adoption. A CHS representative told Carton that, if she omitted Heidbreder's name from the birth certificate, Heidbreder would not be able to stop the adoption unless he registered with the Minnesota Fathers' Adoption Registry within 30 days of the child's birth.

Carton gave birth to K.M.C. on August 12, 2000. Carton omitted Heidbreder's name from the birth certificate, and K.M.C. was placed in an adoptive home two days later. Thirty-one days after K.M.C.'s birth, Heidbreder learned that K.M.C. had been born in Minnesota. That same day, Heidbreder found a website for the Minnesota Fathers' Adoption Registry and registered.

I.

To receive notice of an adoption proceeding, putative fathers whose names are not included on the child's birth certificate and who are not otherwise entitled to notice pursuant to Minn.Stat. § 259.49, subd. 1 (2000), must register with the Fathers' Adoption Registry within 30 days of the child's birth unless excused. Minn.Stat. § 259.52 (2000). Failure to register within that time period may be excused if the putative father proves by clear and convincing evidence that "(i) it was not possible for him to register within the period of time specified in subdivision 7; (ii) his failure to register was through no fault of his own; and (iii) he registered within ten days after it became possible for him to file." Minn.Stat. § 259.52, subd. 8. Lack of knowledge of pregnancy or birth is not an excuse under the statute. *Id.* The court concludes that Heidbreder did not show that it was not possible for him to register or that his failure to register was through no fault of his own. Based on the facts presented, however, Heidbreder's failure to file within 30 days of K.M.C.'s birth was excused under section 259.52, subdivision 8.

Was it possible for Heidbreder to register with the Minnesota Fathers' Adoption Registry within the 30 days, such that his failure to register was his fault? The answer is unquestionably no. It is true in theory that Heidbreder could have attempted to protect his parental rights in each of the 50 states, but such a legal requirement would be inefficient and unreasonable. As a practical matter, it was "not possible" for Heidbreder to register in any state, given that he did not know and had no way of knowing where Carton

was living after she left Iowa. Because he did not know that she was in Minnesota, he had no reason to attempt to protect his parental rights in Minnesota as opposed to some other jurisdiction. As such, I would conclude that it was "not possible" for Heidbreder to register within the required 30–day time period and that his failure to register was "through no fault of his own." Finally, because Heidbreder registered within 10 days of when it became possible for him to do so, I would conclude that Heidbreder demonstrated by clear and convincing evidence that his failure to timely register was excused under section 259.52, subdivision 8.

Based on the statutory provision that "lack of knowledge of pregnancy or birth does not excuse a putative father's failure to timely register," the court asserts:

> [I]t is clear that the legislature intended to foreclose the argument that the birth mother's concealment of any information relating to the pregnancy or birth, including her location during pregnancy or at the time of birth, excuses a putative father's failure to register, regardless of whether the concealment made it "not possible" for the putative father to timely register and his failure to timely register "no fault of his own."

Interestingly, the court provides no support for this statement. The bald assertions contained in this statement have no basis in fact or in law. Moreover, there is no logical stopping point to the court's line of reasoning. Based on the court's interpretation of the "lack of knowledge" provision, it is not clear that there is any circumstance that would make it "not possible" to register and thereby qualify as an excuse under subparts (i)-(iii) of section 259.52, subdivision 8. By stating that, "[i]n the absence of evidence to support a finding of fraud or fraudulent nondisclosure, there is no rea-

son to address whether either would make it 'not possible' for a putative father to register or make the putative father's failure to register 'no fault of his own,' " the court suggests that either fraud or fraudulent nondisclosure would excuse a putative father's untimely registration. This suggestion rings hollow, however, given the court's subsequent conclusion that a claim for fraud or fraudulent nondisclosure cannot exist because a birth mother has no fiduciary duty to inform a father of the child's place of birth. In the process, the court has emasculated section 259.52, subdivision 8(i)-(iii), and violated Minn. Stat. § 645.16 (2000) ("Every law shall be construed, if possible, to give effect to all its provisions."). Although lack of knowledge of pregnancy or birth is not an acceptable reason for failure to register, the issue here is lack of knowledge of where to register.

The court states that it would be "absurd to conclude that a putative father who knew of the pregnancy but did not know the birth mother's location is entitled to greater protection under the statute than a putative father who was ignorant of both the pregnancy and the birth mother's location." This interpretation of section 259.52, subdivision 8, strips it of all meaning by leaving no group of fathers to whom the exception can apply. The only fathers entitled to protection under subdivision 8 are fathers who in fact knew of the pregnancy or birth, given that lack of knowledge of pregnancy or birth is not an excuse. The court's conclusion that fathers who know and fathers who do not know of the birth or pregnancy are excluded from protection under subdivision 8 is not only absurd, but legally impermissible. *See* Minn.Stat. §§ 645.16, 645.17(1), (2) (2000).

The court also states, "while Heidbreder did not know with certainty where Carton was, he had sufficient information to put

him on notice that it was possible she was in Illinois or Minnesota." This statement is speculative,[2] at best, and overly simplistic, given the ease and frequency with which people moved from state to state at the end of the 20th century. The court's statement implies that a putative father must attempt to protect his rights in every state where the birth mother might be.

That Heidbreder did not register in Illinois, where he believed Carton was, or in Iowa, where he believed Carton was not, is irrelevant to the analysis. Registration in either state would not have saved Heidbreder under Minnesota law. Registration in either Illinois or Iowa would not have entitled Heidbreder to notice under Minnesota's statutory scheme. Nor is it true that Heidbreder's registration in another state would have been clear and convincing evidence that it was not possible for him to register in Minnesota or that his failure to register in this state was through no fault of his own.

What matters here is that Heidbreder did not know where Carton was when K.M.C. was born, did not find out where she was until the 31st day after K.M.C.'s birth, and then immediately registered with the Minnesota Fathers' Adoption Registry. Therefore, I would conclude that Heidbreder demonstrated by clear and convincing evidence that it was not possible for him to register within the period of time provided in Minn.Stat. § 259.52, subd. 7 (2000), and that his failure to do so should be excused.

## II.

If, as the court concludes, Heidbreder's failure to register is not excused under section 259.52, subdivision 8, then Heidbreder's interest in maintaining his parental rights has been denied protection under the Due Process Clause. *See Lehr v. Robertson*, 463 U.S. 248, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). A father is entitled to due process when he "demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child.'" *Id.* (quoting *Caban v. Mohammed*, 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)).

Here, Heidbreder demonstrated a full commitment to the responsibilities of parenthood. Heidbreder clearly communicated to Carton that he supported their having the child and that he was opposed to

---

**2.** The court takes umbrage at the suggestion that its statement is speculative and asserts that Heidbreder had sufficient information to believe that Carton was in Minnesota because, of course, a "scared and confused" pregnant teenager would return to her mother despite their bad relationship. This, too, is pure speculation. Moreover, the record makes it clear that Heidbreder knew that Carton had a bad relationship with her mother and had been told by Carton that she would "never move to Minnesota with her mother." Heidbreder Dep. Tr. at 32, 49–50; Carton Dep. Tr. at 32–33. Heidbreder testified:

> Because for one thing, I didn't think she—I didn't—she told me she would never want to live up there because when we were together I told her if she wanted to be around her brothers and sisters that maybe I could transfer, and she said no, I'm not going to follow her. And she said she would never ever move with her mom. And her mom and her barely got along at all. And she told me she didn't like the family—she loved them, but she didn't like the family up here because her grandparents and her were estranged and no one would accept her pregnancy. And she said they wouldn't let her—anybody up here wouldn't—her mom kicked her out of the house in the first place, so I wouldn't think that she would move up here with her mom. And she said she just didn't like the people up here.

Heidbreder Dep. Tr. at 49–50. Thus, Heidbreder had every reason to believe that Carton was not in Minnesota.

adoption.[3] In his deposition, Heidbreder testified:

Q. Did you put her on your checking account?

A. I talked to her about it.

Q. Did you do it?

A. No. She didn't want to.

\* \* \*

Q. [I] told her she had more support and she didn't need to do that.

Q. So you didn't tell her that you would support whatever decision she would make?

A. I would not support adoption or abortion.

\* \* \*

Q. And you said earlier that you indicated to her she had a lot of support for having the child?

A. Right.

Q. Working with you, right?

A. Right.

Heidbreder Dep. Tr. at 25, 39, 55. Heidbreder also went to Carton's medical appointments with her and they lived together for a period of time during Carton's pregnancy. At a minimum, this signifies Heidbreder's effort to provide emotional and moral support to Carton and his intention to establish a personal relationship with K.M.C. Evidently, the court counts the fact that they did not remain together as a strike against Heidbreder.

According to the court, "[t]he record is also void of any evidence that Heidbreder provided, or attempted to provide, financial support to Carton during her pregnancy or to K.M.C. following her birth." This assertion relies on a mischaracterization of the record and is, at least in part, misleading. In fact, Heidbreder could not have provided financial support to Carton and K.M.C. following the birth for the same reason he could not timely register under section 259.52, subdivision 7. He did not know where they were and, given Carton's family's rejection of Heidbreder's involvement in Carton's life, there was no viable vehicle for providing financial support. More important, however, is the fact that K.M.C. was placed for adoption two days after her birth and, according to the court, Heidbreder's parental rights were terminated 30 days after her birth.

With respect to the time period before K.M.C.'s birth, the court fails to recognize that, while Carton provided the money for the first month's rent and security deposit for their apartment, Heidbreder also signed the lease, thereby making himself financially responsible for the rent each month. Heidbreder testified that he talked with Carton about putting her name on his checking account, but Carton did not want this. Heidbreder testified, "I generally felt that my money was her money [ ]." Together, they shared the cost of the food and groceries and Heidbreder's mother and family bought maternity clothes for Carton. Thus, the record does not support the assertion that Heidbreder did not provide or attempt to provide financial support to Carton during her pregnancy.

When Carton left Iowa, Heidbreder maintained contact with her via e-mail, while also attempting to locate her through Carton's family and friends. Although only 19 years of age, Heidbreder talked

3. The court disdainfully dismisses Heidbreder's opposition to adoption because he believed it was "not right." Is the court saying that it will tell a father, or even a mother, what reasons he or she may have for not wanting his or her child adopted? It seems to me that any father or mother sincerely desiring to take on the responsibility of being a parent would believe that adoption was "not right" for his or her children. One wonders what point the court is trying to make.

with an attorney about child support and visitation rights. Heidbreder wasted no time in registering with the Minnesota Father's Adoption Registry once he learned where Carton was located. In sum, Heidbreder did nothing to avoid the responsibilities of parenthood; rather, each action he took had the effect of embracing those responsibilities. When viewed without hostility toward this father, the only reasonable conclusion based on the record before us, is that Heidbreder took steps that evince a clear effort on his part to come forward to participate in the rearing of his child.

The court relies heavily on *Lehr* to conclude that "the statutes, as applied to Heidbreder, adequately protected his opportunity to establish a relationship with K.M.C." In *Lehr*, the Court determined that the father, who was a New York resident, was presumptively capable of asserting and protecting his own rights, but failed to do so having waited 2 years before coming forward to assert paternity. 463 U.S. at 262–65, 103 S.Ct. 2985. Unlike the father in *Lehr*, Heidbreder made sure that Carton knew that he wanted to participate in the rearing of K.M.C. even before K.M.C.'s birth. Heidbreder, however, had no knowledge of where Carton lived and, thus, was not capable of protecting his rights. Because *Lehr* did not involve a father who tried at every turn to grasp the opportunity to develop a relationship with his offspring and accept some measure of responsibility for his child's future, the court's reliance on *Lehr's* holding is misplaced.

In *Lehr*, the Court stated:

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.

*Id.* at 262, 103 S.Ct. 2985. It is clear, as discussed above, that Heidbreder grasped the opportunity and has demonstrated a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child.[4] For this reason, Minnesota's statutory scheme, as interpreted by today's decision, does not adequately protect Heidbreder's parental rights and results in a denial of due process. Put bluntly, section 259.52, subdivision 8, exists to protect any father who is not otherwise entitled to notice under section 259.49, subdivision 1, and who did not register before the expiration of the 30-day period set forth in section 259.52, subdivision 7, if the father can demonstrate by clear and convincing evidence that it was not possible for him to register, that it was not his fault for having failed to register, and that he registered within 10 days after it became possible to do so. If subdivision 8, on the facts presented here, is read, as the court does, to exclude a father such as Heidbreder from its protection, then the statutory scheme fails to protect a father's opportunity to form the parent-child relationship and, consequently, violates due process.

---

**4.** The court asserts that Heidbreder's actions did not "unequivocally indicate an intent to assume full custody" of his child. Whether he indicated an intent to assume "full custody" is not the question to be answered. The correct question is whether he "demonstrate[d] a full commitment to the responsibil-

ities of parenthood by 'com[ing] forward to participate in the rearing of his child.' " *Lehr*, 463 U.S. at 261, 103 S.Ct. 2985 (quoting *Caban*, 441 U.S. at 392, 99 S.Ct. 1760). I conclude, and the record supports, that he did.

A father's biological connection with his child equips him to make uniquely valuable contributions to the child's development. *See Lehr,* 463 U.S. at 262, 103 S.Ct. 2985. By its arrogance,[5] today's decision forecloses the possibility that the best interests of a child can be met by having a permanent and stable relationship with the child's natural father. In doing so, the decision exposes the inadequacies of a system that fails in protecting both the rights of fathers and the best interests of the children who, absent some unfitness on the father's part, need them.

PAUL H. ANDERSON, Justice (dissenting).

I join in the dissent of Justice Page.

GILBERT, Justice (dissenting).

I join in the dissent of Justice Page.

PAUL H. ANDERSON, Justice (dissenting).

I conclude that the majority opinion has an unnecessarily broad reach. The opinion's broad reach is especially problematic for putative fathers who, with the most honorable intentions, seek to assert and fulfill their rights, duties and obligations. Therefore, I am in general agreement with the conclusions reached by Justice Page and join his dissent. I am, however, compelled to add a proviso. I do not concur in the assessment that the majority opinion is arrogant and hostile.

---

5. The court's arrogance lies in its hostility to putative fathers generally, and to this father specifically, as well as in its reading out of Minnesota's statutory scheme section 259.52, subdivision 8.